# NOS. 09-1852 & 09-1860

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————

# UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

-vs-

# BRYAN ROSS and ROBERT BURSTON,

*Defendants-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

## BRIEF FOR THE UNITED STATES

———————

*BARBARA L. McQUADE*
United States Attorney

*CRAIG A. WEIER*
Assistant U. S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9678
Craig.Weier@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

REQUEST FOR ORAL ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT SUMMARY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT

I.   The District Court's Acceptance of Ross' Decision to Proceed *Pro Se* Was
     Not Plainly Erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     A. Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     B. The Court Properly Found that Ross Knowingly and Voluntarily
        Waived his Right to Counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     C. The Court Properly Found that Ross was Competent to Represent
        Himself at Trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     D. Ross was represented at his October 29, 2010 Competency Hearing. . . . . 18

II.  The District Court Did Not Abuse its Discretion by Admitting Plea
     Agreements of Testifying Co-conspirators Containing Polygraph Clauses,
     Nor Did the Prosecutor's Brief Question about it Create Plain Error or
     Amount to Prosecutorial Misconduct.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     A. Standards of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     B. The Court Did Not Abuse its Discretion by Admitting the Unredacted
        Rule 11 Plea Agreement... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C. Eliciting Testimony that Lemus Had Not Been Asked to Take a Polygraph Test Pursuant to his Rule 11 Plea Agreement Did Not Amount to Impermissible Vouching and was Not Plainly Erroneous.. . . . 22

III. Ross Received a Speedy Trial under the Due Process Clause and the Speedy Trial Act... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A. Introduction and Standards of Review.. . . . . . . . . . . . . . . . . . . . . . . . . 23

B. Ross' Pretrial Delay Claim Has No Basis.. . . . . . . . . . . . . . . . . . . . . . . 24

C. Ross Did Not Preserve His Speedy Trial Act Challenge to Delay After June 24, 2008.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

D. Only Five Non-Excludable Days Elapsed Before Trial.. . . . . . . . . . . . . . 25

E. Ross' Attack on the District Court's Ends of Justice Findings Do Not Withstand Scrutiny... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

F. Ross' Reliance on *United States v.Tinklenberg* is Misplaced.. . . . . . . . . . 31

IV. The District Court Did Not Abuse its Discretion or Violate Ross' Right to Compulsory Process by Denying Two Subpoenas. . . . . . . . . . . . 37

A. Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B. Procedural Background and Relevant Facts.. . . . . . . . . . . . . . . . . . . . . 38

C. The Proposed Witnesses Were Not Relevant, Material and Useful to an Adequate Defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

V. The District Court's Conduct Toward Ross Was Not Biased.. . . . . . . . . . . . 43

A. Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B. The District Court's Conduct Was Fair and Impartial, and the Few Arguably Injudicious Comments Did Not Infect the Trial With the Appearance of Partiality so as to Inevitably Influence the Jury. . . . . . . . . 43

ii

VI.   The Prosecutor's Comments in Closing Argument Were Not
      Improper and Not Plainly Erroneous.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

      A. Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

      B. The Prosecutor's Comment about Burston's Subordinate Role in the
         Conspiracy was Supported by the Evidence.. . . . . . . . . . . . . . . . . . . . . . . 46

      C. The Prosecutor's Comments as to Ross were Fair Comments
         Supported by The Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VII.  The District Court Did Not Abuse its Discretion in Denying Ross'
      Motion for New Trial Based on Alleged *Brady* and Discovery
      Violations.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

VIII. Ross' and Burston's Ineffective Assistance of Counsel Claims Are
      Without Merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

      A. Standard of Review and the Strickland Test.. . . . . . . . . . . . . . . . . . . . . . . 55

      B. Ross' Decision to Represent Himself at Trial Forecloses His Claim of
         Ineffective Assistance of Counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

      C. The Record is Not Sufficiently Developed for Review of Burston's
         Major Ineffective Assistance of Counsel Claims. . . . . . . . . . . . . . . . . . . . 56

      D. Burston's Developed Ineffective Assistance Claim Fails the
         Strickland Test.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

IX.   Substantial Evidence Proved Ross' and Burston's Guilt.. . . . . . . . . . . . . . 58

X.    Ross' Sentence Was Reasonable... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

      A. Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

      B. The District Court Properly Resolved Disputed Guideline Issues and
         Properly Calculated Ross' Guideline Range to Impose A Procedurally
         Reasonable Sentence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

XI.   Burston's Due Process Rights Were Not Violated by Ross' Self-
      representation and Trial Conduct................................... 64

XII.  The District Court Properly Exercised its Discretion in Admitting
      Government Exhibit 125, a Copy of the Check Bearing Burston's
      Inked Fingerprint. .......................................... 66

CONCLUSION. ............................................... 68

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B). ............. 68

CERTIFICATE OF SERVICE AND FILING. ........................... 69

RELEVANT DISTRICT COURT DOCUMENTS.. ....................... 70

iv

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Bloate v. United States*, 130 S.Ct. 1345 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Bracy v. Gramley,* 520 U.S. 899 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Campbell v. United States*, 364 F.3d 727 (6th Cir. 2004). . . . . . . . . . . . . . . . . . 64

*Dusky v. United States*, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Faretta v. California,* 422 U.S. 806 (1975). . . . . . . . . . . . . . . . . 12, 13, 16, 17, 55

*Godinez v. Moran*, 509 U.S. 389 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Henderson v. United States,* 476 U.S. 321 (1986). . . . . . . . . . . . . . . . . . 26, 28, 34

*Indiana v. Edwards*,128 S. Ct. 2379 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Johnson v. United States*, 520 U.S. 461 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Liteky v. United States,* 510 U.S. 540 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Lyell v. Renico,* 470 F.3d 1177 (6th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . 43

*McMillan v. Castro*, 405 F.3d 405 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 43, 45

*Miller v. Francis*, 269 F.3d 609 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Murphy v. Cincinnati Ins. Co.*, 772 F.2d 273 (6th Cir. 1985). . . . . . . . . . . . . . . . 21

*Standefer v. United States*, 447 U.S. 10 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . 60

| CASES | PAGE(S) |
|---|---|

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . 10, 55, 57

*United States v. $100,375 in U.S. Currency,* 70 F.3d 438 (6th Cir. 1995). . . . . . . 54

*United States v. Baker*, 458 F.3d 513 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . 20, 66

*United States v. Blackmon,* 874 F.2d 378 (6th Cir. 1989). . . . . . . . . . . . . . . . . 27

*United States v. Blood,* 435 F.3d 612 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . 50

*United States v. Blue*, 557 F.3d 682 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . 61

*United States v. Brown,* 498 F.3d 523 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . 25

*United States v. Crane*, 776 F.2d 600 (6th Cir. 1989). . . . . . . . . . . . . . . . . . . . 30

*United States v. Evans*, 883 F.2d 496 (6th Cir. 1989). . . . . . . . . . . . . . . . . . . . 20

*United States v. Fortson*, 194 F.3d 730 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . 56

*United States v. Francis*, 170 F.3d 546 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . 21

*United States v. Gardner*, 417 F.3d 541 (6th Cir. 2005). . . . . . . . . . . . . . . . . . 56

*United States v. Gardner,* 488 F.3d 700 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . 34

*United States v. Graham*, 484 F.3d 413 (6th Cir. 2007),
   *cert. denied*, 128 S.Ct. 1703 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Hall*, 200 F.3d 962 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Hardy,* 586 F.3d 1040 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . 38

*United States v. Harris*, 165 F.3d 1062 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . 54

*United States v. Henry*, 545 F.3d 367 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . 23

| CASES | PAGE(S) |
|---|---|

*United States v. Hernandez*, 227 F.3d 686 (6th Cir. 2001). . . . . . . . . . . . . . . . . . 62

*United States v. Herrera,* 928 F.2d 769 (6th Cir. 1991). . . . . . . . . . . . . . . . . . . . . 63

*United States v. Herrera-Martinez*, 985 F.2d 298 (6th Cir. 1993). . . . . . . . . . . . 12

*United States v. Hynes*, 467 F.3d 951 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . 43

*United States v. Klat*, 156 F.3d 1258 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . 18, 19

*United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009). . . . . . . . . . . . . . . . . . 60

*United States v. Lee*, 359 F.3d 412 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Lovasco***, 431 U.S. 783 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Mack,* 258 F.3d548 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Marks,* 209 F.3d 577 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 24

*United States v. McDowell*, 814 F.2d 245 (6th Cir. 1987). . . . . . . . . . . . . . . 13, 16

*United States v. Miller*, 910 F.2d 1321 (6th Cir. 1990). . . . . . . . . . . . . . . . . 13, 16

*United States v. Monger,* 879 F.2d 218 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . 29

*United States v. Moore,* 917 F.2d 215 (6th Cir. 1990). . . . . . . . . . . . . . . . . . 38, 41

*United States v. Olano,* 507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . . 12, 23

*United States v. Pierce*, 62 F.3d 818 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Powers*, 500 F.3d 500 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . 43

*United States v. Rentaria,* 106 F.3d 765 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . 20

CASES                                                      PAGE(S)

*United States v. Rogers,* 118 F.3d 466 (6th Cir. 1977).. . . . . . . . . . . . . . . . . . . 24

*United States v. Schmidt,* 105 F.3d 82 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . 56

*United States v. Smith*, 831 F.2d 657 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . 45

*United States v. Sobh,* 571 F.3d 600 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . 27

*United States v. Talley*, 164 F.3d 989 (6th Cir. 1999). . . . . . . . . . . . . . . . 58, 60

*United States v. Tinklenberg,* 579 F.3d 589 (6th Cir. 2010).. . . . . . . 9, 26-28, 31-37

*United States v. Tocco,* 200 F.3d 401 (6th Cir. 2000). . . . . . . . . . . . . . . . . . 21

*United States v. Trujillo,* 376 F.3d 593 (6th Cir. 2004). . . . . . . . . . . . . . . . . 22

*United States v. Valenzuaela-Bernal*, 458 U.S. 858 (1982). . . . . . . . . . . . . . . . 41

*United States v. Young,* 470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Wilson v. Parker*, 515 F.3d 682 (6th Cir. 2008),
   *cert. denied,* 130 S.Ct. 113 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*Zedner v. United States,* 547 U.S. 489 (1976). . . . . . . . . . . . . . . . . . . . . 29, 30


STATUTES & RULES                                           PAGE(S)

18 U.S.C. § 3161. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-29, 31-33, 35, 37

18 U.S.C. § 3162(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Crim. P. 17(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 37, 38, 41

GUIDELINES                                                                    PAGE(S)

USSG § 2B1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

USSG § 3B1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

USSG § 3C1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61


OTHER AUTHORITIES                                                             PAGE(S)

*Bench Book for United States District Judges*
    1.02-5 to -8 (Sept. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## REQUEST FOR ORAL ARGUMENT

Counsel for the United States requests oral argument.

## ISSUES PRESENTED

1.  Whether it was plain error for the district court to fail to inquire into Ross's competence to waive counsel when he had already been found competent to stand trial? (Ross Issue #1).

2.  Whether the district court abused its discretion by admitting the plea agreements of testifying accomplices containing polygraph clauses and whether a brief question about the clause to one witness constituted impermissible vouching? (Ross Issue #2; Burston Issue #4).

3.  Whether pre-indictment delay amounted to plain error and whether the district court clearly erred in denying the defendant's motions to dismiss the indictment on Speedy Trial Act grounds? (Ross Issue #3).

4.  Whether the district court abused its discretion under Rule 17(b) and denied Ross' right to compulsory process by denying two of Ross' numerous subpoena requests? (Ross Issue #4)

5.  Whether the district court's attempts to keep order in the courtroom demonstrated bias toward Ross? (Ross Issue #5).

6.  Whether the prosecutor's closing argument was properly supported by evidence in the record? (Ross Issue #6; Burston Issue #5).

7.  Whether the district court abused its discretion by denying Ross' motion for new trial based on alleged discovery violations? (Ross Issue #7).

8.  Whether Ross, who had stand-by counsel, and Burston were denied effective assistance of counsel at trial? (Ross Issue #8; Burston Issue #2).

9.  Whether the evidence was sufficient to support the jury's guilty verdicts? (Ross Issue #9; Burston Issue #6).

10.     Whether Ross's sentence was procedurally unreasonable? (Ross Issue #10).

11.     Whether Ross' conduct denied Burston a fair trial? (Burston Issue #1).

12.    Whether the district court abused its discretion in admitting a photocopy of a proceeds check bearing Burston's inked fingerprint? (Burston Issue #3).

## STATEMENT OF THE CASE

These are the consolidated appeals of Bryan Ross and Robert Burston from their convictions for conspiracy to utter counterfeit cashier's checks and, as to Ross, five counts of uttering counterfeit cashier's checks. They were tried by a jury on an indictment returned on October 16, 2007, which charged a total of five defendants with conspiracy, and charged Ross with six and Burston with one substantive count of uttering counterfeit securities. (R. 1: Indictment). The trial was held February 4-13, 2009. Ross and Burston were convicted of conspiracy, and Ross to all but one substantive count. (R. 295, 297: Verdict Forms).

On June 26, 2009, the court sentenced Ross to concurrent sentences of 60 months for conspiracy and 78 months on each of the substantive counts. (R. 376: Ross Judgment). Burston was sentenced to 30 months. (R. 377: Burston Judgment; R. 404, TR 6/26/09 at 141-145).

Each filed a timely notice of appeal of his conviction. (R. 366 & 369)

## STATEMENT OF FACTS

From December 2002 through June 2003, Ross organized and directed a group of individuals, including Burston, in a scheme to purchase late-model used vehicles from private owners with counterfeit cashier's checks, and resell them before the buyers discovered the checks were counterfeit. (R. 1: Indictment). Ross used at least 12 people for various roles, including Gabriel Lemus, a self-taught graphic artist, who created the checks by scanning a genuine cashier's check Ross provided and manipulating the image on his computer. (R. 328: Gabriel Lemus, TR at 250-69). Lemus printed 12 of the 16 counterfeit checks admitted at trial. (R. 328: Lemus, TR at 312-318).

Ross assigned teams to respond to newspaper advertisements in local newspapers and portray themselves as people looking for a car. (R. 328: Aliska Walton, TR at 1192-2000; Bishop, TR at 1402-1412; Dennis Goode, TR at 539-551). Ross used an old girlfriend and single mother in need of cash (Aliska Walton)(R. 328: Walton, TR at 1192-1200); an old friend (Dewayne Eli) and his girlfriend (Akela Bishop)(R. 328: Bishop, TR at 1408-11); a rapper signed to a record label Ross owned (Robert "Boo" Burston)(R. 328: Lemus, TR at 275-78, 287-90, 301-02; Bishop, TR at 1433-40; Walton, TR at 1230-41; Goode, TR at 556-587); a drug addict (Dennis Goode) (R. 328: Goode, TR at 541-550); and an

old friend (Derek Arnold)(R. 328, Walton, TR at 1218-25). Ross also used Kevin

Bell and Remundo Dean to retitle cars obtained in the scheme. (R. 328: Lemus,

TR at 83; Walton, TR at 1192; Bell TR at 1324-50). Two recruits, his fiancé's

cousin (Djanada Montgomery), and another drug addict (Deborah Blount), were

used only once and arrested trying resell a Lexus for Ross. (R. 328, Montgomery,

TR at 1032-79; Blount at 929-57).

Evidence at trial established Ross's participation in 14 transactions involving

16 counterfeit checks totaling $312,100.[1] Evidence presented at sentencing

identified 22 transactions in all, of which the court held Ross responsible for 15,

resulting in losses of $355,800. (R. 403: Sentencing TR at 46-47; R. 404: TR

6/26/09 at 98, 125).

Burston was Ross's assistant (R. 328: Lemus, TR at 275-78, 287-88). Burston

and Ross picked up counterfeit checks together more than once (*Id.*), and Burston

did so alone "at least one time" (*Id.* at 290). Burston also provided Lemus with

information to use to create counterfeit checks. (*Id.* at 288). Burston was involved

in the purchase of four vehicles with counterfeit checks, and the resale of one of

those four. (R. 328: Goode, TR at 544-48 (purchase of minivan in Livonia), 588-

---

[1]Sum of Government's Exhibits 102-104; 109-117 (R. 328, Lemus, TR at 313-318) and Government's Exhibits 105-108 (R. 328, Wells, TR at 1105-12; Miller, TR at 1586-1589).

96 (purchase of Cadillac in Taylor), 556-88 (purchase and resale of Lexus in Oak Park); Bishop, TR at 1433-42 (purchase of a Ford Explorer in Clinton Township[2]).

When Goode and Burston resold the Lexus they purchased in Oak Park, the buyer paid with two checks, one payable to Dennis Goode for $6,000, and one payable to "Joseph Goode" (but given to Burston) for $5000. (R. 328: TR 2/6/09 (Goode) at 556-88). When Goode and Burston cashed the checks, the bank required each to place an inked fingerprint on the check, and captured the transaction with surveillance cameras. (*Id.*; R. 429 at 5: Government's Exhibit 125). The print on the Joseph Goode check was Burston's. (R. 328: Robert Koteles, TR at 773, 764-772, 774-809; Darren Dodd, TR at 746-755).

After "discharging" a series of four court-appointed lawyers, Ross ultimately insisted on representing himself (with standby counsel) at trial. (R. 5: 10/22/07 Magidson Appearance; R. 76: 1/8/08 Edison Appointment; R. 98: 4/2/08 Kinney appointment; R. 101: 4/21/08 Early Appointment; R. 185: TR 6/16/08 at 59-60 (Early becomes Standby Counsel); R. 262: Korn Appointment as Standby Counsel; R. 328: TR 2/13/09 at 1993-94 (Korn Appointment)).

Twenty-one days after S. Allen Early was appointed, Ross moved to represent himself (R. 107: Motion for Self Representation). He had previously filed pro se

---

[2]This purchase was the subject of Count 3 of the indictment, and Burston was found not guilty of this count.

5

motions, but never formally moved to represent himself up to that point. (*See, e.g.,* R. 73; R. 77; R. 82 and R. 87). Initially, the court denied Ross' motion. Ten days later, Ross filed a motion to "substitute counsel," citing difficulties in his relationship with Early. (R. 139: Motion to Substitute Counsel). At the hearing, Early advised the court that Ross refused to communicate with him and that "I strongly feel that he has created this breakdown in the attorney/client relationship purposely for the purpose of creating error here. I am still offering my help to him. He is rejecting it." (R. 185: 6/16/08 Motion TR at 34-35). He added: "I will state, again, [Ross] is a highly intelligent person and I don't see any impediment to him representing himself at trial" (*Id.* at 36). The court denied Ross' motion for substitute counsel, finding it part of a pattern he had exhibited with each of his attorneys and "a manifestation of a desire to delay the inevitable, and that is, a trial in the case." (*Id.* at 57). Ross then reasserted his right to self representation. (*Id.* at 57-58). On June 16, 2008, after another round of advice and warnings, the court found that Ross knowingly and voluntarily waived his right to counsel and permitted him to represent himself, assigning Early the role of standby counsel. (*Id.*).

Prior to trial, the government twice asked the court to order that Ross be evaluated for competency, as more specifically addressed in Argument 1, below.

6

Ultimately, the court ordered an evaluation and found the defendant competent to stand trial and to represent himself. (R. 203: Order Finding Defendant Competent to Stand Trial; R. 396: 10/29/08 Competency Hearing TR at 14).

Ross' difficulties with standby counsel continued, however, and on the day before a trial date, he filed an "Emergency Motion" alleging that Early tampered with a defense witness, Orlando Cajamarca, by telling him that "if Ross is found guilty, you will get your money back. You do want your money back, don't you[3]?" (R. 248: Emergency Motion at 2). Early responded that the allegations were false and "a continuation of false and frivolous allegations that he has made against counsel in an effort to derail his trial and create error. . .". (R. 253: Early's Response at 3-4). Cajamarca was called as a witness, however, and after his testimony, the court found that he "essentially denied each and every material allegation contained in [Ross'] motion" (*Id.* at 76).

The court denied Ross' motion to remove Early, concluding that since Ross' allegations were false, there was no basis for the relief he sought. Nevertheless because the acrimony between them would "prevent any effective interaction," the court granted Early's oral motion to withdraw as counsel. (*Id.* at 77-79). The

---

[3]Cajamarca had apparently purchased one or more cars Ross or his accomplices obtained with counterfeit checks.

following day, Richard Korn was appointed standby counsel at trial. (R. 262:

Order; R. 328: TR 2/13/09 at 1993-94).

## ARGUMENT SUMMARY

The district made the appropriate inquiries and gave Ross the necessary advice before finding that he knowingly and voluntarily waived his right to counsel. The court's findings that Ross was competent to stand trial and to represent himself were properly based on an unchallenged expert opinion, supported by the court's own observations and the opinion of Ross' counsel. Moreover, the hybrid representation afforded Ross at his competency hearing fully protected his rights.

The district court did not abuse its discretion by admitting plea agreements of testifying co-conspirators containing polygraph clauses given the long-established practice of allowing the prosecution to inquire into plea agreements on direct examination. Moreover, it was not improper for the prosecutor to ask one question of one witness to establish that he had not taken a polygraph test when Ross' standby counsel had suggested that the government was concealing the results of a test.

Ross received a speedy trial under the Due Process Clause and the Speedy Trial Act. Ross' pre-indictment delay claim was not raised below and he has demonstrated neither actual prejudice nor governmental bad faith and therefore

cannot prevail under any standard. As to the Speedy Trial Act claim, Ross only preserved a challenge to the pretrial period through June 24, 2008, as he did not bring another STA motion until after trial. Reviewing the issue de novo, only five non-excludable days elapsed from the commencement of the speedy trial clock until Ross came to trial, even if the entire pretrial period is considered. Ross' attacks on the court's ends of justice findings are without merit, inasmuch as the court demonstrated on the record that it weighed the competing factors and explained the reasons for its findings. *Tinklenberg* is inapplicable.

The district court did not abuse its discretion or violate Ross' right to compulsory process by denying two subpoenas because the proposed witnesses were not relevant, material and useful to an adequate defense; because Ross was able to establish the same facts with other witnesses that were called; and because, as to one witness, the record strongly indicates he was available for trial.

The district court did not display bias against Ross. Instead, the district court's conduct was fair and impartial, and its few arguably injudicious comments did not infect the trial with the appearance of partiality so as to inevitably influence the jury.

The prosecutor's comments in closing argument were not improper and not plainly erroneous. The prosecutor's comment about Burston's subordinate role in

the conspiracy was supported by the evidence, and the analogy to Ross' courtroom conduct was an isolated comment in rebuttal having no prejudicial potential in light of the weight of the evidence against Burston. The prosecutor's closing comments as to Ross were fair comments supported by the evidence.

The district court did not abuse its discretion in denying Ross' motion for new trial based on alleged *Brady* and discovery violations. Ross is unable to identify any exculpatory evidence withheld; he was fully advised about the prior statements of witness Montgomery in time to effectively cross-examine her; he failed to raise the issue of interview notes of witness Lemus in his motion for new trial; and he does not present any exceptional circumstances to justify appellate review.

Ross' and Burston's ineffective assistance of counsel claims are without merit. Ross' decision to represent himself at trial forecloses his claim of ineffective assistance of counsel. The record is not sufficiently developed for review of Burston's major ineffective assistance of counsel claims because there is no way of determining whether Burston's decision to forego a motion for severance and waive opening statement was a matter of sound trial strategy. The developed ineffective assistance claim Burston presents fails the *Strickland* test. Burston was

not prejudiced if one of his exhibits was not sent back to the jury room during deliberations no matter what the reason.

The district court properly resolved disputed guideline issues as to Ross, meticulously addressing each of Ross' objections to the presentence report and making specific factual findings with direct attribution to sources in the record, in properly calculating Ross' guideline range to impose a procedurally reasonable sentence.

Burston's due process rights were not violated by Ross' self-representation and trial conduct. Burston's argument amounts to a "cumulation of non-errors," which cannot serve as grounds for such a claim.

Finally, Burston's claim of error relative to the admission of Government's Exhibit 125 (a photocopy of a proceeds check bearing Burston's inked fingerprint), that the original was not preserved for him to test for latent fingerprints, was not raised in the district court, and the district court did not plainly err in admitting this highly probative evidence.

ARGUMENT

## I.  The District Court's Acceptance of Ross' Decision to Proceed *Pro Se* Was Not Plainly Erroneous.

### A.  Standard of Review.

Because Ross insisted on self-representation, this Court reviews the district

court's decision to allow him to proceed *pro se* for plain error. *United States v.*

*Herrera-Martinez*, 985 F.2d 298, 301 (6th Cir. 1993). Plain error is "(1) 'error,'

(2) that is 'plain,' and (3) that 'affect[s] substantial rights." *Johnson v. United*

*States*, 520 U.S. 461, 466-67 (1997), *quoting: United States v. Olano,* 507 U.S.

725, 732 (1993). "If all three conditions are met, [we] may then exercise [our]

discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s]

the fairness, integrity, or public reputation of judicial proceedings.' " *Id*. at 467

*quoting: Olano*, 507 U.S. at 732.

### B.  The Court Properly Found that Ross Knowingly and Voluntarily Waived his Right to Counsel.

The Sixth Amendment gives criminal defendants both the right to counsel and

the right to self-representation. *Faretta v. California,* 422 U.S. 806 (1975). If a

defendant chooses to proceed *pro se*, however, he must knowingly and voluntarily

waive the benefits afforded by the right to counsel. *Faretta*, 422 U.S. at 835. To

waive counsel, a defendant must be "aware of the dangers and disadvantages of

12

self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (internal citation omitted).

In *United States v. McDowell*, 814 F.2d 245 (6th Cir. 1987), this Court invoked its supervisory powers "to identify the nature of the inquiry to be made and the procedure to be followed henceforth in situations where an accused seeks to waive representation and proceed *pro se.*" 814 F.2d at 250. It adopted the inquiry set forth in the Bench Book for United States District Judges and instructed that, whenever a defendant expressed a wish to represent himself, the judge must use the model inquiry or one covering the same substantive points and make an explicit finding, on the record, that the defendant knowingly and voluntarily waived his right to counsel. *Id.* at 250-51.

The model inquiry addresses the defendant's knowledge of the law, his previous experience proceeding *pro se*, the potential penalties for the charged crimes, the defendant's familiarity with the rules of evidence and procedure, and the dangers of proceeding alone. *Id.* at 251-52. The trial court is only required to "substantially comply" with the model. *United States v. Miller*, 910 F.2d 1321, 1324 (6th Cir. 1990). The Bench Book is itself revised periodically, and the Fifth

Edition was in effect during the waiver at issue here. *Bench Book for United States District Judges* 1.02-5 to -8 (Sept. 2007).

In this case, the court engaged in the colloquy on more than one occasion. First, at a May 30, 2008 hearing on Ross' Motion to Exercise Right to Self Representation (R. 107), the court inquired:

> COURT: Mr. Ross, have you ever studied law, sir?
> ROSS: Yeah, briefly.
> COURT: Explain.
> ROSS: Not to the extent the attorneys here have, but I been to the law libraries for the last three or four months.
> COURT: Have you ever had any formal law education?
> ROSS: Have I been in school? No.
> COURT: Have you ever represented yourself in a criminal action before?
> ROSS: Not until today.
> COURT: Do you want to represent yourself or do you just want a different lawyer?
> ROSS: I would rather represent myself.
> COURT: All right, do you understand that you've been charged with crimes that could result in a custody sentence of considerable length?
> ROSS: Yes, sir.
>  * * *
> COURT: Do you understand that if you represent yourself, you're on your own, you don't have any help from anybody?
> ROSS: I don't have any help now, sir.
> COURT: I believe you do, but answer my question. Do you understand that if you represent yourself you will be on your own and you won't have any help?
> ROSS: Yes, I understand that, your honor.
> COURT: Are you familiar with the Federal Rules of Evidence?
> ROSS: I have read some briefly.
> COURT: You have just read some briefly?

14

ROSS: Yeah. I'm studying them, in the process right now. Trial is
June 24. I'm prepared to– I plan to be prepared by then.
COURT: Do you understand the Federal Rules of Evidence govern
the evidence in this case and that – and will tell you what can and
cannot be introduced at the trial?
ROSS: Yes, I do, your honor.
COURT: All right. Are you familiar with the Federal Rules of
Criminal Procedure?
ROSS: Briefly.
* * *
COURT: In my opinion, a trained lawyer would defend you far better
than you could defend yourself. I think it's unwise for you to try to
represent yourself. You're not familiar with the law, you're not
familiar with the court procedures, you're not familiar with the Rules
of Evidence, and I would strongly urge you not to represent yourself,
but to have a lawyer represent you. Do you understand that?
ROSS: Yes, I understand that, your honor.
COURT: Very well, do you have any questions for me right now?
ROSS: No, sir.

(R. 174: TR 5/30/08 at 29-32). The court denied the motion without prejudice,

telling Ross that he could ask again later to take over his own representation if he

wished. (*Id.* at 32-33).

On June 16, 2008, at another hearing on Ross' Motion to Substitute Counsel,

the court again addressed the voluntariness of Ross' waiver of counsel. The court

advised Ross that he was making a "perilous and unwise decision" and reminded

him that he could be sentenced to up to 65 years in prison. The judge repeated that

it his opinion a trained lawyer would defend Ross "far better" than he could do

himself." (R. 185: TR 6/16/08 at 57-60).

15

Finally, on December 9, 2008, the court again addressed self-representation:

> COURT: Now, Mr. Ross, you have indicated several times that you want to represent yourself. You probably believe that my questioning you is repetitive, but it is required by the law. I do want to make sure, for the record, that it is still your desire to represent yourself. Is it?
> ROSS: Yes, it is.
> COURT: All right. And you understand the maximum penalties that can be imposed if you're convicted in this case, correct?
> ROSS: Yes, I do.
> COURT: Do you understand the difficulties that you may face because you are untrained in the rules of procedure and evidence?
> ROSS: Yes, I do, your Honor.
> COURT: All right. Understanding all of that, it is still your desire to continue to represent yourself, is that correct?
> ROSS: Yes, it is.
> COURT: Very well. We have made our record.

(R. 268: TR 12/9/08 at 78-79).

Where the district court addresses the substantive points of the model inquiry, a waiver challenge is without merit. *Miller*, 910 F.2d at 1324-25. Here, in the court's three colloquies with Ross, every aspect of the model inquiry was addressed. *McDowell* does not require the district court to use the word "intelligently" in its findings as Ross seems to suggest. Ross was made "aware of the dangers and disadvantages of self- representation," and his choice was made "'with eyes open.'" *Faretta*, 422 U.S. at 835. There was no error, so it is not necessary to proceed further in the plain error analysis.

16

### C. The Court Properly Found that Ross was Competent to Represent Himself at Trial.

The Supreme Court addressed competency to waive counsel in *Godinez v. Moran*, 509 U.S. 389 (1993). The Supreme Court "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from)" the trial competency standard. *Id*. at 398. Thus, under *Godinez,* when an accused is found competent to stand trial, he is also competent to waive counsel.

Ross asserts that *Indiana v. Edwards,* 128 S. Ct. 2379 (2008), requires a higher level of competency for self representation at trial. But *Edwards* held only that a state *may* constitutionally *force representation* on an unwilling criminal defendant under certain circumstances without running afoul of his *Faretta* rights. "[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky v. United States*, 362 U.S. 402 (1960), but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards* explicitly left *Godinez* intact. Moreover, *Edwards* itself declined to accept Indiana's invitation to set "a more specific standard that would 'deny a criminal defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or jury.'" (citation omitted). 128 S. Ct. at 2388.

Ross forcefully asserted his competence below, objecting to both motions for evaluation (R. 114; R. 167: Ross' Responses), and agreeing with Dr. Nixon's written evaluation (R. 427: Nixon Report; R. 396: TR 10/29/08 at 5, 10, 14-15). His appellate counsel's attempts to show that his behavior was irrational came too late. (Ross Brief at 7: Ross not grasping "reality of the proceedings.").

In making its competency determination the court had the benefit of Ross' own assertions, the opinion of his appointed counsel, and an expert opinion as to Ross' competency as well as its own observations of Ross' work product over the course of almost 12 months during which Ross filed approximately eight *pro se* motions and participated, to some extent, in six hearings. It made specific findings relative to Ross' competence to stand trial and to conduct his own defense. (*Id.* at 8-14). Had the court denied Ross' permission to represent himself under these circumstances, it would have violated his Sixth Amendment right to self-representation.

### D. Ross was represented at his October 29, 2010 Competency Hearing.

Ross argues lastly that the court erred in allowing him to represent himself at the October 29, 2008, competency hearing, relying on *United States v. Klat*, 156 F.3d 1258 (D.C. Cir. 1998), for the proposition that, when competence is reasonably in question, a defendant may not waive his right to counsel until the

issue is resolved. (Ross Brief at 19). *Klat*, however, is inapposite. There, the

district court never found, prior to the competency hearing, that the defendant had

waived her right to counsel. 156 F.3d at 1263, n.4. Ross, in contrast, had

knowingly and intelligently waived his right to counsel on June 16, 2008, over

four months prior to the competency hearing. Moreover, *Klat* had no attorney in

any capacity for two months prior to and during her competency hearing. Here,

Ross' court-appointed attorney was assigned the role of standby counsel

immediately upon the court's acceptance of Ross' waiver, and the court thereafter

allowed a form of "hybrid" representation, in which both Ross and standby

counsel were given the opportunity to address every issue before the court,

including the issue of competency on October 29, 2009. (R. 396: TR 10/29/08 at

4-7, 10, 14-15). The court did not err in following this procedure.

## II. The District Court Did Not Abuse its Discretion by Admitting Plea Agreements of Testifying Co-conspirators Containing Polygraph Clauses, Nor Did the Prosecutor's Brief Question about it Create Plain Error or Amount to Prosecutorial Misconduct.

### A. Standards of Review.

All evidentiary rulings are reviewed for abuse of discretion. *United States v.*

*Mack,* 258 F.3d548 (6th Cir. 2001). Abuse of discretion occurs only when a court

relies on clearly erroneous factual findings, improperly applies the law or uses an

erroneous legal standard. *United States v. Baker*, 458 F.3d 513, 517 (6th Cir. 2006).

"'[W]hen a party fails to object to evidence at the trial court, his contention on appeal will prevail only if the trial court's evidentiary decision was plainly erroneous, thus affecting his substantial rights and resulting in a miscarriage of justice.'" *Id., quoting United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989).

Because Ross' standby counsel objected to the polygraph provision of the plea agreements,[4] both Ross and Burston are deemed to have preserved the issue for appeal, despite Burston's silence. *Baker*, 458 F.3d at 518 (a silent co-defendant may avoid plain error review if any defendant puts court on notice).

Because neither defendant objected to the prosecutor's question to Lemus establishing that he had not taken a polygraph test (R. 328: TR 2/5/09 at 331), the plain error standard of review is applicable, both to the answer itself, and as to any claim of governmental misconduct for asking the question. *See United States v. Rentaria,* 106 F.3d 765 (7th Cir. 1997).

---

[4]Only three of seven testifying accomplices entered into plea and cooperation agreements admitted into evidence. (R. 328: TR 2/5/09 at 323, Exhibit 101 (Lemus); TR 2/10/09 at 1233-34, Exhibit 135 (Walton); TR 2/11/09 at 1495-96, Exhibit 140(Bishop)). Ross' objection came after the Lemus agreement was admitted, but before its was discussed, and the court found it timely (*Id.*, TR 2/5/09 at 323-330). The court later acknowledged that Ross' objection to Lemus' provision functioned as an objection to all. (*Id.* at 402-410).

## B. *The Court Did Not Abuse its Discretion by Admitting the Unredacted Rule 11 Plea Agreement.*

Ross and Burston claim that the court abused its discretion, in the first instance, by admitting the plea agreements without redacting the polygraph provision providing that the cooperating defendant "agrees to submit, upon request, to Government-administered polygraph examinations to verify the Defendant's full and truthful cooperation." (R. 328: TR 2/5/09 at 405). However, neither have provided any support or developed any arguable basis for this contention, standing alone. Perhaps this is because this Court has long allowed prosecutors to ask witnesses about the terms of their plea agreements to deflect the use of the agreements by the defense to attack their credibility. *United States v. Tocco,* 200 F.3d 401, 416-17 (6th Cir. 2000); *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). Additionally, this Court has recognized that a person's willingness to take a polygraph examination is relevant to his credibility. *Murphy v. Cincinnati Ins. Co.*, 772 F.2d 273, 277 (6th Cir. 1985).

In this case, the trial court found, relying on *Murphy*, that the polygraph provision was sufficiently probative that it was not necessary to redact it from an otherwise admissible document (the Rule 11 Agreement) to which no other objection had been raised. (R. 328: TR 2/5/09 at 406-08). The court did not abuse its discretion on this score.

### C. Eliciting Testimony that Lemus Had Not Been Asked to Take a Polygraph Test Pursuant to his Rule 11 Plea Agreement Did Not Amount to Impermissible Vouching and was Not Plainly Erroneous.

Counsel's only concern expressed at a bench conference at the time of the objection about the polygraph provision at trial was that it ". . .suggests to the jury that, hey, maybe they did a polygraph on him." (R. 328: TR 2/5/09 at 330). Shortly after the objection was overruled, the prosecutor asked the witness ". . .but we didn't ask you to take a polygraph, did we?" to which the witness responded "No." (*Id.* at 331). This was the only testimony concerning polygraphs elicited by the government from any witness[5] and is the sole basis for the claim that the government impermissibly vouched for the credibility of Lemus.

Improper "vouching" occurs when a prosecutor indicates a personal belief in the witness' credibility, by either directly expressing it or by implying that he has special knowledge of facts not before the jury. *United States v. Trujillo,* 376 F.3d 593, 607-08 (6th Cir. 2004).

Ross and Burston argue that by eliciting the fact that Lemus was not asked to take a polygraph, the prosecutor implied that he believed him, thereby vouching for his testimony. They assert, that there could be no other reason to ask the

---

[5]Ross, however, asked both Lemus and Dennis Goode, who had *no cooperation agreement* with the government, whether the government asked them to "verify" their accounts by taking polygraphs. (*Id.* at 370; TR 2/6/09 at 693).

question. However, viewed in context it should be apparent that the prosecutor was responding to defense concerns that the language suggested to the jury that the witness had taken and passed a polygraph. There is nothing improper about insuring that the jury does not assume a fact that does not exist.

Even if the question was improper, Ross and Burston have not demonstrated "flagrancy" necessary for a finding of misconduct. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). Nor have they demonstrated plain error by explaining how the error "affects substantial rights" and "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (1993).

## III.  Ross Received a Speedy Trial under the Due Process Clause and the Speedy Trial Act.

### A. Introduction and Standards of Review.

Ross, whose thirty pretrial motions generated some fifteen hearings and whose pretrial behavior toward appointed counsel caused the serial withdrawal of three attorneys and the appointment of a fourth to serve as standby trial counsel, now complains that the court did not get him to trial fast enough.

His preindictment delay claim was not raised below and must therefore be reviewed for plain error. *Olano*, 507 U.S. at 732.

23

Interpretation and application of the Speedy Trial Act are reviewed de novo, but fact finding for clear error. *United States v. Marks,* 209 F.3d 577 (6th Cir. 2000).

### B. Ross' Pretrial Delay Claim Has No Basis.

The Due Process Clause provides safeguards against dilatory prosecutions, but its role in restricting preindictment delay is "limited," implicated only if (1) the defendant suffers *actual* prejudice and (2) the government acts in bad faith. *United States v. Lovasco***,** 431 U.S. 783, 789 (1977); *see also United States v. Rogers,* 118 F.3d 466, 477 n.10 (6th Cir. 1977)("the standard for preindictment delay is nearly insurmountable, especially because proof of actual prejudice is always speculative.").

Ross has not shown either actual prejudice or bad faith. His only specific "prejudice" claim, that exculpatory telephone records were not preserved, is refuted by Government's Exhibit 122, which demonstrates that the exculpatory records hypothesized by Ross never existed.[6] (R. 428: Government's Exhibit 122; Argument VI(D), below). Moreover, Ross does not even allege governmental bad

---

[6]Because Ross was the subscriber of the telephone number used in the offense alleged in Count Two, any "calling information" from that number during the period would show that call, and thus be incriminating rather than exculpatory.

faith in the indictment's timing. Thus, there is no basis for his preindictment delay claim.

### C. *Ross Did Not Preserve His Speedy Trial Act Challenge to Delay After June 24, 2008.*

The review of Ross' Speedy Trial Act (STA) claim should be limited to the period before June 24, 2008, the subject of Ross' first motion to dismiss on STA grounds (R. 125: 5/28/08 Motion to Dismiss), because Ross waived any challenge to the later period by failing to raise the issue again until *after* trial. (R. 292: 2/17/09 Motion to Dismiss). 18 U.S.C. § 3162(a)(2) ("Failure of the defendant to move for dismissal prior to trial. . .shall constitute a waiver of the right to dismissal under this section."). *United States v. Brown,* 498 F.3d 523, 529-30 (6th Cir. 2007).

### D. *Only Five Non-Excludable Days Elapsed Before Trial.*

Ross' trial commenced well within the 70-day appearance-to-trial provision of 18 U.S.C. § 3161(c)(1). As demonstrated when Ross brought his STA motion (R. 141: Government's Response), only five non-excludable days elapsed to the June 24, 2008 trial date,[7] based on the following calculations.

---

[7] 6/24/08 was the fifth scheduled trial date. On 11/19/07, trial was set for 1/10/08 (R. 34), but adjourned to 2/26/08 on 12/17/07, to 4/23/08 on 2/6/08, to 4/24/08 on 3/19/08, and to 6/24/08 on 4/28/08 (Docket Entries).

A total of 249 days elapsed from October 18, 2007 (the date of the defendant's initial appearance, not counted in the calculation per *United States v. Tinklenberg,* 579 F.3d 589, 593 (6th Cir. 2010)), through June 23, 2008 (the period reviewed by the district court before trial). Of those, 166 days are excludable under § 3161(h)(7)(A) on court-ordered continuances supported ends of justice findings (unrelated to pending motions).[8] Another 38 days are excludable under § 3161(h)(1)(F) because the defendant's motions were under consideration (at times other than those excluded by the court for other reasons).[9] *Henderson v. United States,* 476 U.S. 321 (1986). Thirteen days are also excludable under § 3161(h)(1)(F) as a result of consideration of the defendant's bond motion which was deferred and never renewed.[10] The remaining 32 days of arguably non-excusable delay ((249)-(166+38+13)=32) must be reduced, under § 3161(h)(7), by delay resulting from joinder with co-defendants whose speedy trial time has not

---

[8]R. 60 (1/10/08 to 2/26/08 excludable); R. 80 (1/24/08 to 4/22/08 excludable); R. 103 (4/8/08 to 6/24/08 excludable). Overlap aside, these orders provide 166 days of excludable delay, i.e., from 1/10/08 to 6/24/08).

[9]R. 42, 43, 44 and 45 were filed December 3 and denied on December 6, 2007, resulting in 4 days of excludable delay; R. 52, 53, 54 and 55 were filed on December 6, 2007 and dismissed on January 25, 2008, resulting in another 34 days of excludable delay (December 7, 2007 to and including January 9, 2008) after factoring out the overlapping dates from other excluded periods.

[10]*See* R. 35: 11/20/07 Bond Motion; R. 40: Response; R. 391: TR 12/20/07 at 10-13: Hearing on Motion to Withdraw (first attorney) and Bond Motion.

run. *United States v. Sobh,* 571 F.3d 600, 602 (6th Cir. 2009)(in multi-defendant cases there is just one 70-day clock which begins when the last defendant appears in court). Burston, tried with Ross, did not make his initial appearance on the indictment until November 14, 2007, 27 days after Ross' initial appearance. (Docket Entry 11/14/07). Under § 3161(h)(7) and *Sobh*, the first 27 days after Ross' initial appearance should be excluded from speedy trial calculations, leaving only five non-excludable days prior to June 24, 2008.[11]

Even if Ross preserved his right to challenge the subsequent period, June 24, 2008 to the February 4, 2009 trial,[12] there are no additional countable days. Including June 24, 225 days elapsed through February 3, 2009. One hundred twenty-nine of those days are excludable under § 3161(h)(8)(A) on court-ordered

---

[11]The district court found 31 countable days elapsed to June 24, 2008 (R. 148: Order at 4-5). However, the court, despite acknowledging the "one clock rule" in its order (*Id.* at 1-2, *citing United States v. Blackmon,* 874 F.2d 378, 380 (6th Cir. 1989)), began the clock, in its calculation, at Ross' 10/19/07 arraignment rather than Burston's 11/14/07 initial appearance. (*Id.* at 2-5). Had the court used Ross' *initial appearance* date (10/18/07), as required by *Tinklenberg, supra,* at 593, it would have found 32 countable days which, when reduced by the 27 days between Ross' and Burston's initial appearances, leaves five countable days.

[12]2/4/09 was the tenth scheduled trial date. The 6/24/08 trial date was adjourned to 8/18/08 on 6/19/08; to 11/24/08 on 10/29/08 (the trial schedule had been suspended, in part, due to the competency issues in the case), to 12/2/08 on 11/24/08, to 1/5/09 on 12/2/08, and to 2/4/09 on 12/23/08. (Docket Entries).

continuances supported by ends-of-justice findings.[13] Seventy-two days are

excludable under § 3161(h)(1)(A) for delay resulting from the mental competency

determination.[14] *See Tinklenberg,* 579 F.3d at 595. Of the 24 days remaining

((225)-(129)=96; (96)-(72)=24), all are excludable by operation § 3161(h)(1)(F).

*See Henderson,* 476 U.S. at 326-329.[15]

### E. Ross' Attack on the District Court's Ends of Justice Findings Do Not Withstand Scrutiny.

Ross argues that some of the trial court's ends-of-justice findings are

inadequate. He articulates no basis for his bare assertions that the court "failed to

---

[13]*See,* R. 150 (6/24 - 8/18/08 excludable); R. 238 (11/24 - 12/2/08 excludable); R. 251 (12/3/08 - 1/5/09 excludable); and R. 265 (1/6 - 2/3/09 excludable). These orders provide for 129 days of excludable delay.

[14]The government's second competency motion (R. 164) was filed on 7/30/08, and heard on 8/5/08 (R. 395: TR 8/5/08). The court entered two orders pertaining to competency on 8/5 and 8/12 (R. 176; R. 184). These dates are within the period found excludable due to unavailable witnesses (R. 150: 6/24-8/18 excludable). Thus, only 8/19/08 through 10/29/08 (competency hearing) are excluded on this basis to avoid overlap. (R. 396: TR 10/29/08; R. 203: Order).

[15]R. 168 a government motion to exclude certain evidence, and R. 172, a motion for Rule 17(b) review of Ross' requests for upwards of 80 witness subpoenas (which resulted in a lengthy *ex parte* hearing between the defendant, his standby counsel and the court on 11/13/08 (R. 382: TR 11/13/08)), were filed shortly before the competency evaluation was ordered, but set for a hearing on 11/6/08. The period from 10/30 (day after competency determination) through 11/6/08, 8 days, is therefore excludable. R. 208: Ross' Motion to Suppress Statements, and R. 209, Burston's Motion to Exclude Evidence were filed on November 6 and 7, respectively, and set for hearing held 11/24/08. That period of 17 days is likewise excludable.

do a proper balancing," didn't "seriously consider" factors on the record or gave

"no consideration" to the factors. (Ross Brief at 24-26). Ross correctly states the

law pertaining to ends-of-justice continuances under the STA, but does not apply

it correctly here.

In *Zedner v. United States,* 547 U.S. 489 (1976), the Court enforced the plain

meaning of 18 U.S.C. § 3161(h)(8), in reversing the conviction of a defendant who

had been tried outside of the 70-day rule based on the trial court's reliance on his

waiver of STA rights. 547 U.S. at 506-08. Now found at § 3161(h)(7),

§ 3161(h)(8) provided, first, that periods of delay arising from a court's

continuance based on findings that the ends of justice served by the delay

outweigh the best interests of the defendant and the public in a speedy trial, are

excludable from STA calculation and, second, that such periods are never

excludable unless the court sets forth in the record its reasons for that conclusion,

either orally or in writing. Because the district court in *Zedner* should not have

accepted a waiver and made no finding even suggesting that it had considered and

balanced the competing interests identified in the statute, the periods were not

excludable. *Id.*

In *United States v. Monger,* 879 F.2d 218, 220-21 (6th Cir. 2003), this Court

held that findings justifying an ends-of-justice continuance must be placed

explicitly in the record. *But see United States v. Crane*, 776 F.2d 600, 660 (6th

Cir. 1989)(findings do not have to be entered at the time the continuance is

granted). *See also Zedner,* 547 U.S. at 507 (findings could be placed on the record

when determining motion to dismiss under STA, but contemporaneous findings

are "best practice").

Ross argues that the ends-of-justice findings in R. 60, R. 80, R. 103, R. 104,

R. 238, R. 251 and R. 265 are "inadequate." Yet these orders either expressly state

the reasons for the various continuances, or reference parts of the record that do,

and contain express findings that the ends of justice outweigh the best interests of

the public and the defendants in a speedy trial. *See* R. 60 (need of all four

defendants for more time to review and analyze voluminous discovery to

adequately assess and prepare pretrial motions, and adequately prepare for trial;

fifth defendant not yet arraigned); R. 80 (due to new attorney's need for time to

obtain and review discovery, to try a scheduled murder case, and for a preplanned

vacation, court found continuance necessary to allow attorney time to develop

relationship with Ross and allow adequate time for trial preparation), *see also* R.

392: TR 1/24/08 at 13-14 (more on ends-of-justice continuance granted in R. 80);

R. 103 (cites R. 96: order for withdrawal of Ross' attorney itself containing ends-

of-justice language; notes next attorney almost immediately recused himself,

necessitating the appointment of new counsel who was on case only one week),

*see also* R. 148: Order Denying Ross' Motion to Dismiss at 4; R. 104 (granting

Burston's attorney's motion to withdrawal; continuance necessary to ensure

continuity of counsel and adequate time for preparation); R. 238 (need for the

attorneys to review newly discovered documents and adequately prepare for trial);

R. 251 (need for additional time to review newly discovered documents and

adequately prepare for trial); R. 265 (citing withdrawal of first standby counsel

because Ross "unreasonably refus[ed] to cooperate" with him, need of new

standby counsel for time to review discovery and discuss the case with Ross in

order to effectively carry out his duties as standby counsel).

### F.  Ross' Reliance on United States v.Tinklenberg is Misplaced.

Ross argues that the district court's reliance on 18 U.S.C. § 3161(h)(1)(D), to

exclude delay "resulting from any pretrial motion, from the filing of the motion

through the conclusion of the hearing on, or other prompt disposition of, such

motion" was erroneous in light of *Tinklenberg*, which held that "a pretrial motion

must actually cause a delay, or the expectation of a delay, of trial in order to create

excludable time" under § 3161(h)(1)(D) of the STA. 579 F.3d at 598.[16] First, since

Ross waived his right to assert the post-June 24, 2008 delay as a basis for

---

[16]As noted in the analyses above, 51 days were excluded on this basis prior to
June 24; 24 thereafter, for a total of 75 days.

dismissal (see Argument III(C)), there were less than 70 countable days of delay prior to his trial in any case.[17] Second, *Tinklenberg* is distinguishable from the present case such that it has no effect on the outcome here. Third, even if *Tinklenberg* operated to disallow all excludable delay relied upon by the district court or the government's analysis above, one government motion, not relied upon in either analysis, squarely falls within the ambit of delay excludable under that case, thus rendering Ross' trial timely even under Ross' broad reading.

*Tinklenberg* held that "a pretrial motion must actually cause a delay, or the expectation of a delay, of trial in order to create excludable time" under § 3161(h)(1)(D) of the STA. 579 F.3d at 598. It disallowed the exclusion of time in which two inconsequential government motions (for a deposition and for permission to bring firearms into the courthouse) and one significant defense motion (to dismiss) were filed and decided. *Id.* at 599-600. This disallowance, although affecting only 13 days, was enough to put the defendant's trial outside of the STA's 70-day rule and, accordingly, the case was dismissed. *Id*. Ross urges that, under *Tinklenberg,* the district court erred in excluding the time that pretrial motions were pending.

-----

[17]This argument was developed above and establishes that, even if all excludable pre-June 24, 2008 delay stemming from the pendency of pretrial motions were disallowed under the above analyses, Ross' trial would have commenced after only 56 days of countable delay.

Ross reads *Tinklenberg* much too broadly. *Tinklenberg*'s specific holding was that the pendency of motions which were filed *after* the trial date had been set, which did *not necessitate hearings*, which *were not expected* to delay and which *did not actually delay* the trial, was not excludable under the STA. *Id.* at 597-600. But the Court upheld the finding of excludable delay for the 20 days from the filing of Tinklenberg's second motion for competency examination to the date that the examination was granted without specific regard to any actual or threatened effect on a trial date.[18] The motions filed, heard and decided in the present case, like the competency motion in *Tinklenberg*, were not filed after the actual trial date had been scheduled, were almost all set for hearings, and could be expected to delay, or actually delayed, the trial date.

In *Tinklenberg*, the Court had direct evidence, by virtue of a trial date set before the motions were filed, that the motions neither delayed, nor had the potential to delay, the trial. The Court underscored the fact that no one expected the late motions to affect the trial date; in fact, the trial actually began a day early. 579 F.3d at 599-600. Moreover, the Court expressed concern that the purpose of the STA could be frustrated by allowing the government to file "a flurry of

_____

[18] § 3161(h)(1)(A) (providing for exclusion of competency motion's time) and 3161(h)(1)(D) (providing for exclusion of time pretrial motions are pending) both contain the identical language *Tinklenberg* focuses on, i.e., "delay resulting from" the proceedings. *Id.* at 594-95.

evidentiary motions before trial" thus "avoiding its responsibility to conduct timely prosecution." *Id*.

*Tinklenberg* also relied on the fact that the late motions at issue were "resolved without a hearing," and cited, with approval, *United States v. Gardner,* 488 F.3d 700, 717 (6th Cir. 2007) for the proposition that "'[i]f a motion requires a hearing, the entire time from the filing of the motion through the date of the hearing is excludable.'" *Id*. at 597. *Henderson* stands for the same proposition. 476 U.S. at 326, 329-30. *Bloate v. United States*, decided after *Tinklenberg,* seems to accept that proposition as settled law. 130 S.Ct. 1345, 1353 (2010).

Here, in stark contrast with *Tinklenberg*, none of the motions generating excludable delay were filed after the final trial date was set. (R. 265: 12/23/10 Order Adjourning Trial to 2/4/09). Thus, there were not late-filed "mundane" or "evidentiary" motions from the government that had no potential for delay. On the contrary, Ross' thirty pretrial motions can be broadly seen as contributing significantly to the ten rescheduled trial dates here.

Additionally, all the pretrial motions here, save four, were scheduled for hearings, unlike those leading to the *Tinklenberg* dismissal. Only Ross' early motions, (R. 42: Motion to Dismiss Counts Due to Multiplicity filed 12/3/07; R. 43-45: Motions for Discovery, Dismissal (Multiplicity) and Bill of Particulars,

respectively, filed 12/5/07), were summarily denied on 12/6/07. (R. 49: Order

Denying Motions). Only four days of excludable delay were ascribed to them

below, however. The others were all set for hearings, and, under *Tinklenberg*, had

at least some potential for delay, thus making their pendency period excludable.

Even those motions deemed "motions in limine" were significant motions (*e.g.*, R.

208: Motion to Suppress Statements; R. 260: Motion to Dismiss for Loss or

Destruction of Evidence), scheduled for hearings in advance of trial.

Ross specifically objects only to the district court's exclusion of the period

during which his motion for modification for bond was pending (November 20,

2007 to December 20, 2007) under § 3161(h)(1)(D), but cites only to *Tinklenberg*,

and does not articulate why this motion did not cause or have potential to cause

delay. (Ross Brief at 23; R. 148: Order Denying Ross' Motion to Dismiss at 2-3).

There is no indication in *Tinklenberg* that modification of bond motions do not

qualify for exclusion. This motion was set for a hearing and addressed on

December 20, 2007, but continued at Ross' request pending appointment of new

counsel, as his first appointed counsel withdrew on that same date, and Ross

wanted a new attorney to argue the motion for him. (R. 391: TR 12/20/07 at 8-12).

Moreover, on December 3 and 5, 2007, Ross filed the four motions discussed

above, and, immediately upon their summary dismissal, filed four motions on

35

December 6, 2007. (R. 52-55: Motions) which were set for hearing on January 18, 2008. (Docket Entries). And, on December 19, 2007, his attorney moved to withdraw, a motion that was also heard and granted on December 20, 2007. Thus, even if the pendency of the bond motion was not excludable, despite its being scheduled for hearing, heard and deferred on December 20, 2007, only the period from November 20 through December 4, or 16 days, are attributable to that single motion.

Finally, even if this Court were to disallow the all the findings of excludable delay based on the pendency of pretrial motions made by the district court and relied upon in the government's analysis above, one motion– R. 57: Government's Motion to Reschedule Dates – falls squarely within *Tinklenberg*'s "expectation of delay" ambit. It was not relied upon by the district court or in the government's analysis set forth above because it was filed while another motion (R. 35: Motion for Modification of Bond) was pending and would have been redundant. However, this motion clearly excludes 6 days from the STA calculation, and thus establishes, even under the broadest reading of *Tinklenberg*, that Ross' trial was timely.

The motion to reschedule was filed on December 12, 2007, before all defendants even appeared.[19] The motion was not scheduled for a hearing, as all

_____

[19]Dewayne Eli, who was a Michigan inmate at the time, did not appear until
(continued...)

defendants before the court agreed that additional time was needed for adequate trial preparation. On December 17, 2007, the court granted the motion (R. 60) and adjourned the trial date from January 10, 2008, to February 26, 2008. The court's ends-of-justice determination affected only the period of January 10 to February 26, 2008, and was silent on the period from the motion's filing to the court's disposition. Those six days, December 12-17, 2007, should be excluded from STA calculations. The motion to reschedule was a pretrial motion under § 3161(h)(1)(D) which directly sought and resulted in a delay of the trial date. Thus, under the broadest *Tinklenberg* application, the six-day pendency of this motion, including the filing date and disposition date, must be excluded. When it is, Ross' speedy trial clock stops at 69.

## IV.    The District Court Did Not Abuse its Discretion or Violate Ross' Right to Compulsory Process by Denying Two Subpoenas.

### A. *Standard of Review.*

This Court reviews denial of a motion under Federal Rule of Criminal Procedure 17(b) for abuse of discretion and "should not reverse unless the exceptional circumstances of the case indicate that defendant's right to a complete,

---

[19](...continued)
12/19/07. (R. 57). The government did not argue for a 12/19/07 speedy trial clock start date below. It can, however, be considered in this Court's *de novo* review in the event the court disallows the basis for other findings of excludable delay.

fair and adequate trial is jeopardized." *United States v. Moore,* 917 F.2d 215, 230 (6th Cir. 1990).

Claims of denial of the Sixth Amendment's right to compulsory process are reviewed *de novo*. *United States v. Hardy,* 586 F.3d 1040, 1043 (6th Cir. 2009).

### B. Procedural Background and Relevant Facts.

On June 16, 2008, the district court told Ross to provide his witness list to the government and asked it to issue and serve his subpoenas. The government agreed, but when Ross' list ballooned to 80 witnesses, the government filed a petition for a Federal Rule of Criminal Procedure 17(b) review. (R. 172: 17(b) Motion; R. 179: Ross' Response). When Ross' numerous requests became an issue at the August 5, 2008, motion hearing, the court, noting that the U.S. Marshall's Service had begun serving Ross' subpoenas, directed that they suspend service pending Ross' competency evaluation. (R. 395: TR 8/5/08 at 8, 14, 17-18, 22-23).

At a later hearing, the court announced that it would undertake an ex parte review of Ross' subpoena requests with Ross and stand-by counsel. (R. 397: TR 11/6/08 at 3-7). During that review, the court asked Ross why he wanted to prove a *broader* conspiracy than charged, and Ross explained his theory that the case agent (Dodd) was suppressing evidence of other crimes of Ross' accomplices in order to "narrow the conspiracy to me, when it's not about me," and framing him.

(R. 382: TR 11/13/08 at 7-8; 17-18). Ross asked the court for a subpoena for

Bernard Hemker, incorrectly telling the court that Lemus was directly involved in

purchasing Hemker's car with a counterfeit check.[20] (*Id.* at 42-43). Ross continued

that the witness was necessary to show that the investigation was faulty, that

". . .Agent Dodd hid those facts altogether." The court denied the request as

unnecessary. (*Id.*). Ross later asked for a subpoena for Keith Colosanti, another

victim of the scheme (but not of a substantive charge). (*Id.* at 56-57). Ross said

Colosanti identified Lemus as having been on the scene of his transaction contrary

to Lemus' prior assertions. (*Id.*). When the court directly asked Ross if he wanted

Colosanti to prove Lemus was on the scene, Ross replied "No, to describe the

whole modus operandi of all the people who came to his home, just happened to

be Lemus, Eli and Dennis Goode." (*Id.*). When the court asked him what was

unique about Colosanti as opposed to various other victims among the forty

subpoenas he had reviewed to that point, Ross said that the investigators "hid

evidence" seized from Dennis Goode when he was arrested driving Colosanti's

vehicle. (*Id.* at 57-59). Hearing that this was the theory being pursued, the court

decided that Ross could subpoena a detective involved in the investigation, but

---

[20]Hemker's transaction was not alleged as a substantive offense or an overt act in the indictment. (R. 1: Indictment). Hemker did not identify Lemus as the person who purchased his vehicle. (R. 429: Sentencing Exhibit 6 at 3-4: Investigative Synopsis of Hemker transaction).

that Colosanti would be cumulative. (*Id.*). In all, the court reviewed 104 witness requests (*Id.* at 115-117), authorizing thirty. (R. 359: *Ex Parte Order*). Ross later went back to the court for two additional witnesses and records. (R. 360, R. 361, R. 363).

No further mention was made of the subpoenas for Hemker or Colosanti. Goode, involved in the Colosanti purchase, testified that Lemus was not at the scene.[21] (R.328, Tr. 2/6/09 at 596-600).  Under Ross' cross-examination, Lemus admitted that agents "showed me evidence that someone had picked me out of a lineup," but didn't recall if it was Colosanti. (*Id.*, Tr. 2/5/09 at 359).  Dodd was later called as Burston's witness, testifying that he conducted photographic lineups with several victims and none identified Burston. (*Id.* 2/12/09 at 1735-40). Although he had the relevant report, Ross never asked Dodd about the photographic lineup he conducted with Colosanti. (*Id.* at 1755-75). There are strong indications in the record that, despite the denial of the subpoena, Ross was able to secure Colosanti's voluntary appearance. On February 11, 2009, Ross told the court through his standby counsel that Keith Colosanti and 13 other witnesses were still expected to testify. (R. 328: TR 2/11/09 at 1460-65). The next day, Ross

---

[21]According to a written report of case agent Darren Dodd, appended to Ross's objections to the PSR as Exhibit 5A-5B, Colosanti picked Lemus out of a photographic array Dodd showed him on May 27, 2003.

mentioned that Kimberly Dent, for whom the court had authorized a subpoena (R. 359), was willing to appear without a subpoena. (R. 328: TR 2/12/09 at 1795). Ross called and examined one witness, then rested. (*Id.* at 1826). Standby counsel then asked the court if "I can release the witnesses that I have in the attorney conference room" (*Id.*). Those witnesses were never identified, but Colosanti remained on the witness list, as did Ross' twelve other witnesses, until he rested.

### C. The Proposed Witnesses Were Not Relevant, Material and Useful to an Adequate Defense.

The Sixth Amendment does not give a defendant the right to secure the attendance of "any and all witnesses: it guarantees 'compulsory process for obtaining witnesses *in his favor*.' U.S.Const., Amdt. 6." *United States v. Valenzuaela-Bernal*, 458 U.S. 858, 867 (1982)(emphasis in original). Thus, to establish a violation of the right to compulsory process, a defendant must make some plausible showing of how the testimony would have been both material and favorable to his defense." *Id.*

Federal Rule of Criminal Procedure 17(b) provides in part that a court must order a subpoena for a witness if a defendant shows inability to pay witness fees "and the necessity of the witness's presence for an adequate defense." In *Moore*, this court recognized that the broad discretion afforded by Rule 17(b)'s requirement the witness be shown to be "necessary to an adequate defense" is

41

limited by the Sixth Amendment's right to compulsory process, and that "necessary," in a constitutional context, means "relevant, material and useful to an adequate defense." 917 F.2d 215, 230-31 (6th Cir. 1990).

Denying the Hemker subpoena was not an abuse of discretion because Lemus did not purchase Hemker's vehicle and therefore Hemker would have added nothing to the defense. (R. 429: Sentence Exhibit 6 at 3). As for Colosanti, Ross initially suggested that Colosanti might provide impeachment information on Lemus who had not yet testified. But when he was asked directly why he needed the subpoena, Ross stated that he wanted to demonstrate the "modus operandi" of "all the people" and, elaborating, that the police and agent "hid evidence" seized when Goode was arrested in Colosanti's vehicle. (R. 382: TR 11/13/08 at 56-7). Given the court's approval of a subpoena for the detective involved in the case, its finding that Colosanti was not necessary to the defense was proper.

## V. The District Court's Conduct Toward Ross Was Not Biased.

### A.  Standard of Review.

Because there was no objection, the plain error standard applies. *United States*

*v. Hynes*, 467 F.3d 951, 957-58 (6th Cir. 2006).

### B.  The District Court's Conduct Was Fair and Impartial, and the Few Arguably Injudicious Comments Did Not Infect the Trial With the Appearance of Partiality so as to Inevitably Influence the Jury.

The government agrees that the Due Process Clause requires "a fair trial in a

fair tribunal." *Bracy v. Gramley,* 520 U.S. 899 (1997). Fairness, however, does not

require passivity. *United States v. Powers*, 500 F.3d 500, 511 (6th Cir. 2007). A

trial judge may interject himself into the trial to clear up confusion regarding the

evidence or to aid in its orderly presentation. *Id. citing McMillan v. Castro*, 405

F.3d 405, 410 (6th Cir. 2005). Reversible error occurs only where the trial court's

conduct falls so "demonstrably outside" the acceptable range of judicial behavior

so as to amount to "hostility or bias" toward defendant. *Id*.

This Court has adopted the Supreme Court's interpretation of statutory recusal

standards in *Liteky v. United States,* 510 U.S. 540 (1994), to determine judicial

bias claims under the Due Process Clause. *Lyell v. Renico,* 470 F.3d 1177, 1186

(6th Cir. 2006) (citation omitted). Under *Liteky*, only judicial misconduct that is so

extreme as to "display clear inability to render fair judgment" that is, which

"display[s] a deep-seated favoritism or antagonism that would make fair judgment

impossible" is characterized as bias or prejudice. 470 F.3d at 1186-87 (*quoting*

*Liteky* at 551).

Ross complains of three incidents in which the court intervened to correct

Ross' improper questions[22] and five comments of the court that Ross found

"demeaning, sarcastic and, in a few instances, hostile."[23]

---

[22]Interjection to: (1) correct Ross when he challenged Blount's answer and suggested she was "lying" about an inconsequential point (how long she had known a boyfriend)(R. 328: TR 2/9/09 at 957-58); (2) point out "you just asked that question," when Ross asked Walton substantially the same question twice (R. 328: TR 2/10/09 at 1296-97); (3) tell Ross that cross-examination was not to be used to argue his case after asking Montgomery twice "would it shock you to know" that she testified like other witnesses. (TR 2/11/09 at 1662-63).

[23](1) in response to Ross' request to "refresh" Blount's recollection after she directly answered his question, the court replied "it doesn't seem like it needs refreshing, Mr. Ross." (TR 2/9/09 at 988-89); (2) when Ross explained that he was asking Walton the same question twice because he thought "she didn't understand," the court stated it "could not imagine how you derive that understanding from her answer. She said she didn't know, and between then and now I don't think she figured it out." (TR 2/10/09 at 1296-97); (3) when Ross asked Bishop for the *fifth time* who owned a vehicle she was riding in on a particular day and in response to an "asked and answered" objection by the government, the court said: "Well, it has been, and the question is argumentative, Mr. Ross. You got an answer. You didn't like the answer. You asked again in an argumentative way and the answer is the same. It's been that way for about a week now, and it's not working, so you need to try something else." (TR 2/11/09 at 1557-58); (4) when Ross asked Montgomery for the fourth time if she used the name "Dawada," in response to a government objection, the court said "Mr. Weier, I think she is handling this just fine" (TR 2/11/09 at 1650); (5) when Ross asked Montgomery whether she made prior arrangements with Secret Service

(continued...)

Thus, in a trial spanning ten days, and producing some 1996 pages of transcript, Ross points to eight excerpts from the record to establish "judicial misconduct" that so infected the trial "with the appearance of partiality" that the conduct would "inevitably have left the jury" improperly influenced. *McMillan*, 405 F.3d at 410. Only a cursory review of the record demonstrates that he has failed.

To balance any possibility that the jury misunderstood his position, the trial judge instructed the jury that he had no interest in the case (R. 328, TR 2/4/09 at 190-91); that they were the exclusive factfinders and that nothing he said or did should influence their decisions about the facts (TR 2/13/09 at 1858); that his comments and questions were not evidence (*Id*. at 1861); that they should not interpret his rulings on objections as any indication as to how he thought the case should be decided (*Id.* at 1866), and, again, that nothing he did or said during the trial was meant to influence their decision (*Id*. at 1976-77). These instructions insured that even the few comments of which Ross complains did not improperly influence the jury. *See United States v. Smith*, 831 F.2d 657, 663 (6th Cir. 1987) (stressing the importance of jury instructions on bias).

---

[23](...continued)
Agent Dodd for her children, in response to a relevance objection the court said "I didn't know the secret service provided baby sitting services, Mr. Ross," to which Ross immediately replied "I didn't ask that." (*Id*. at 1660).

## VI.    The Prosecutor's Comments in Closing Argument Were Not Improper and Not Plainly Erroneous.

### A. Standard of Review.

Because Ross and Burston failed to object to the government's comments. this

Court reviews for plain error. *United States v. Young,* 470 U.S. 1 (1985).

### B. The Prosecutor's Comment about Burston's Subordinate Role in the Conspiracy was Supported by the Evidence.

Burston's sole complaint is that, in rebuttal, the prosecutor analogized an event

that occurred during arguments to Burston's role in the conspiracy:

> The second thing Mr. Lemus told you was that as time went by Mr.
> Burston would also, first, stop by to pick up checks with Mr. Ross,
> but then Mr. Ross sent him to pick up the checks. Just like Mr. Ross
> spilled water on the table and told Mr. Burston to clean it up just now,
> Mr. Burston was involved in this conspiracy and was taking orders
> from Bryan Ross.

(R. 328: TR 2/13/09 at 1964). Burston claims, without explanation, that this

comment was "an impermissible attack on Burston's character" that amounted to

an error that was "so rank" that it "should have been apparent to the trial judge

without objection," or that struck at the "fundamental fairness, honestly or public

reputation of the trial." (Burston Brief at 34). But the comment is devoid of any

character attack and really focuses on something *Ross* did. In any case, it was a

fair analogy for conduct which the evidence proved in numerous ways: that

Burston worked for Ross during the course of the conspiracy. (*See* R. 328: TR

2/5/09 (Lemus) at 275-90; TR 2/6/09 (Goode) at 544-96; TR 2/10/09 (Bishop) at 1433-42). The comment was appropriate and supported by the record.

### C. The Prosecutor's Comments as to Ross were Fair Comments Supported by The Evidence.

Ross claims that the prosecutor's assertion in closing argument that Exhibit 122 (Sprint/Nextel Subscriber information) was circumstantial evidence of his involvement in the conspiracy to fraudulently obtain Kim Beneteu's vehicle was not adequately supported by the evidence. (Ross Brief at 36). Beneteau, the victim in count two of the indictment, received a call on December 27, 2002 from (313) 220-2780 (retrieved from her "caller id") to set up the fraudulent purchase of her vehicle. (R. 328: TR 2/5/09 (Beneteau) at 481-83). Exhibit 122 clearly indicates that "subject number" (313) 220-2780 was registered to Bryan Ross from 10/25/02 to 6/30/08. (R. 428: Exhibit 122; R. 328: TR 2/5/09 at 515-19). Ross is simply attempting to exploit on appeal a minor error in the Sprint/Nextel witness' testimony when initially identifying the document. *Id.* Ross' cross-examination made it clear that he understood that Exhibit 122 shows subscriber information for telephone number (313) 220-2780. (*Id.* at 519-522). The document itself, although containing two numbers (the basis for the initial error), clearly associates Ross to the subject number (313) 220-2780 through the telephone account numbers. (R. 428: Exhibit 122). The argument was supported by the evidence.

47

Ross also claims that the prosecutor "falsely implied" in rebuttal that Ross was "responsible" for Dewayne Eli's incarceration, because "there was no testimony or evidence relating to what Dewayne Eli was charged with in state and federal prisons and no evidence as to how much time Eli served. . ." (Ross Brief at 38). Eli's prison sentences and their connection to the scheme were established both through Bishop (*Id.,* TR 2/11/09 at 1505) and Walton (*Id.,* 2/10/09 at 1307-08), and relevant to counter Ross' assertions that Eli's friends and family were blaming Ross to protect Eli, Ross going as far as accusing Lemus of having a gay affair with Eli (*Id.*, TR 2/5/09 at 363, 372, 374 and 387). The absurdity of that position became clear through testimony that Eli had been convicted in two different courts as a result of the scheme, and had began serving what amounted to two consecutive two-year terms before Ross ever came to trial. (*Id.,* TR 2/13/09 Government's Rebuttal Argument at 1969).

Ross' other claims involve fair argument based on the evidence. That he "invented the scheme" and "made thousands and thousands and thousands of dollars" from it is supported by the testimony of various accomplices, including Goode (R. 328: TR 2/6/09 at 586)(thousands given to Ross on resale of fraudulently obtained Lexus); (*Id.* at 592-93)(thousands given to Ross on resale of Cadillac), Lemus (*Id.* TR 2/5/09 at 309)(Ross "took the larger portion of the

money and the rest would be divided up amongst the people who were involved in it"); (*Id.* at 259-270)(Ross brought Lemus a genuine Comerica cashiers check and asked him to recreate it; Lemus learned Ross using checks to purchase vehicles), Bishop (*Id.,* TR 2/10/09 at 1408-12)(Bishop heard Ross approach Dewayne Eli, her boyfriend, stating that he had "something on the floor," which meant a way of making money illegally, just prior to their involvement in the conspiracy), and Walton (*Id.* at 1197-1202)(Ross recruited Walton and told her what to do in the scheme to make money). All seven accomplices who testified said they had been recruited directly or, as for Bishop, indirectly, by Ross. The record fully supported the arguments that he "invented" the scheme and made "thousands."

In addition, the record is replete with evidence that Ross used others, including his ex-girlfriend, both to purchase and resell vehicles with counterfeit cashiers checks, as this strategy was part of his scheme. Indeed, of the 14 transactions involving 16 counterfeit cashiers' checks presented at the trial, Ross was personally involved in only one purchase, a rare corvette from Dale Wells, subjects of Counts 5, 6 and 7. (*Id.*, TR 2/10/09 (Wells) at 1094-1160). Insulating himself from the actual transactions was an integral part of Ross' plan which was proven and fairly argued.

Since Ross' claims of impropriety are not supported by the record, it is not necessary to discuss the elements of a claim of prosecutorial misconduct.

## VII.    The District Court Did Not Abuse its Discretion in Denying Ross' Motion for New Trial Based on Alleged *Brady* and Discovery Violations.

This Court "reviews denial of a motion for new trial based on *Brady* violations under an abuse of discretion standard. However, the district court's determination as to the existence of a *Brady* violation is reviewed *de novo*." *United States v. Graham*, 484 F.3d 413, 416-17 (6th Cir. 2007), *cert. denied*, 128 S.Ct. 1703 (2008)(internal citations omitted). It reviews denial of a discovery request for abuse of discretion. *United States v. Blood,* 435 F.3d 612, 627 (6th Cir. 2006).

Ross' argument that the court should have granted him a new trial because of the government's "discovery violations," "*Brady* violations," and "late notifications" (Ross Brief at 39-45) is without support and was properly rejected below. (R. 339: Order Denying Motion for New Trial; R. 401, TR 6/8/09, Motion Hearing at 34-49). Ross unsuccessfully raised some of the same issues previously in a motion to dismiss the indictment. (R. 257: Motion in Limine to Dismiss Indictment; R. 266: Government's Response; R. 279, TR 1/5/09 (Hearing Transcript) at 28-34; R. 267: Order Denying Motion in Limine).

Ross first claims that evidence existed that would have shown that telephone number (313) 220-2780 (which appeared on victim Beneteau's caller identification when she received a call setting up the fraudulent purchase of her vehicle) was not his telephone number, that such evidence was exculpatory, and that it was suppressed by the government. (Ross Brief at 40). However, telephone subscriber records clearly indicated that (313) 220-2780 belonged to Ross at the time the call was placed. (R. 428: Exhibit 122; Argument VI(D)).

Ross next claims that the government withheld his telephone records and purportedly those of certain accomplices (obtained by local investigative agencies with local search warrants), and that those records were somehow exculpatory. (Ross Brief at 42-43). In fact, telephone records of a *victim's* number (made available pretrial and disclosed to Ross during trial) were obtained by search warrant by local authorities and, as a result, a search warrant for two other numbers (identified by Ross as accomplice numbers) was drafted, but never executed, and  no records were obtained. (R.328: Tr. 2/11/09 at 1474-82). Another local police agency indicated that it had obtained a search warrant for telephone records for Ross' number ((313) 220-2780), but ultimately, found that it had no such records in its possession. (*Id.*). No records were "withheld." Even if some other phone records existed Ross has not shown that they were unavailable

as there is no indication that he ever attempted to obtain the records through a

subpoena. *See Bell v. Bell*, 512 F.3d 223, 236 (6th Cir. 2008)(no government duty

to disclose information otherwise available to defense).

Ross next claims that he did not receive notes pertaining to information

provided by Djanada Montgomery until she testified, and that Montgomery's

testimony "unfairly surprised" him. (Ross Brief at 42). In fact, two disclosures

were made regarding Ross' visit to Montgomery's house upon her release from jail

after her arrest for trying to sell a vehicle obtained by fraud for Ross. The first was

a Detroit Police Department report, which was turned over to the defense well in

advance of trial. (R. 328: TR 2/12/09 Statement of Prosecutor at 1831-32). That

report did not mention Ross' activities inside the house at that time. (*Id.*) The

second was the case agent's rough notes of a November 21, 2008, pretrial

preparation interview which were disclosed to the defense when used to refresh

Montgomery's memory at trial. (R. 328: TR 2/11/09 at 1635-36, 1647; TR 2/12/09

at 1706-11 (Ross Oral Motion to Dismiss for *Brady* violation relating to

Montgomery notes), 1831-33). Ross used the notes to cross examine Montgomery

(R. 328: TR 2/11/09 at 1647-48), and did not ask for additional time to review the

notes or prepare for cross-examination in light of their disclosure. (R. 328: TR

2/11/09 at 1644-63). Nor did Ross recall Montgomery in his own case. (R. 328:

TR 2/12/09 at 1798-1826). The district court's determination that disclosure of the rough notes was timely was well within its discretion. (R. 328: TR 2/12/09 at 1710-11).

Ross also claims that the timing of the November 20, 2008, disclosure of investigative materials from the Oakland County Sheriff's Department [OCSD] was done in bad faith and prejudiced him because he did not have adequate time to review them for trial. (Ross Brief at 43-45). On November 20, 2008, at the time of a pretrial preparation meeting, OCSD Detective Chris Cole turned over four boxes of records, reports and recordings he produced during a local investigation into the same scheme, that had not been previously turned over to the government. (R. 418: TR 11/20/08 (status conference) at 2-8; R. 274; R. 275: TR 11/24/08 (motion hearing) at 4-20; R. 328: TR 2/12/09 (Cole) at 1811-24). Cole removed the records from the OCSD records room and stored them in his garage after obtaining a trial subpoena in June 2008. (R. 328: TR 2/12/09 at 1812-14). There is no indication that these records were intentionally secreted, nor any indication that any of the records were even used by Ross at trial. (Ross Brief at 43-45). The government notified the court and Ross' standby counsel immediately upon their discovery (R. 418: TR 11/20/08 at 2-8), and began to copy all of the materials for the defense, a process that was fully completed by December 3, 2008, (R. 279: TR 1/5/09

(Hearing on Ross' Motion to Dismiss for Discovery Violations) at 16-22). After being fully informed of the discovery process in this case, the district court observed that ". . .the file has been open to an extent that parallels or equals any open file cases that I have seen by the Government since I have been on the bench . . .since the summer of 2000," in denying Ross' Motion to Dismiss based on alleged discovery violations. (R. 279: TR 1/5/09 (Motion Hearing) at 33-34). The trial began on February 4, 2009, thus allowing Ross over 60 days to review the OCSD documents. Ross cannot establish that any materials were withheld, cannot establish bad faith, and cannot establish prejudice resulting from the late discovery of these documents. The district court did not abuse its discretion in denying his motion for a new trial.[24]

---

[24]Ross' complaint that he was not advised of the substance of witness Lemus' pretrial preparation interview in which Lemus recanted and changed some of the information previously provided to the case agent (Ross Brief at 43) was not raised in Ross' motion for a new trial (R. 291: Ross' Motion for New Trial; R. 300: Ross Memorandum in Support), and is therefore not subject to review absent "exceptional circumstances" not present here. *United States v. $100,375 in U.S. Currency,* 70 F.3d 438, 441 (6th Cir. 1995) (appellate court will not review issues on appeal not raised and ruled upon below absent exceptional circumstances); *see also United States v. Harris*, 165 F.3d 1062 (6th Cir. 1999)(failure to ask for ruling on discovery motions precludes appellate review).

## VIII.  Ross' and Burston's Ineffective Assistance of Counsel Claims Are Without Merit.

### A. Standard of Review and the Strickland Test.

Ineffective assistance of counsel claims are mixed questions of law and fact, and are therefore reviewed de novo. *See Strickland v. Washington*, 466 U.S. 668, 698 (1984); *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995). "Deficiency" under *Strickland* means that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the Sixth Amendment and that the trial cannot be relied upon as having produced a just result. 466 U.S. at 687-88. "Prejudice," requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* at 694.

### B. Ross' Decision to Represent Himself at Trial Forecloses His Claim of Ineffective Assistance of Counsel.

Where a defendant knowingly and voluntarily waives his right to counsel and elects to represent himself at trial, he may not later complain of ineffective assistance of trial counsel. *Wilson v. Parker*, 515 F.3d 682, 696 (6th Cir. 2008), *cert. denied,* 130 S.Ct. 113 (2009). "Logically, a defendant cannot waive his right to counsel and then complain about the quality of his own defense." *Id.*, *citing Faretta v. California*, 422 U.S. 806, 834 n.46 (1975). This is true even where a

defendant has the services of standby counsel for advice. *Wilson,* 515 F.3d at 698; *see also United States v. Schmidt,* 105 F.3d 82, 89-90 (2d Cir. 1997)("Because Schmidt proceeded *pro se,* she may not now assign blame for her conviction to standby counsel.").

### C. The Record is Not Sufficiently Developed for Review of Burston's Major Ineffective Assistance of Counsel Claims.

This Court will not review claims of ineffective assistance of counsel for the first time on direct appeal "because the record is usually insufficient to permit an adequate review of such a claim." *United States v. Gardner*, 417 F.3d 541, 545 (6th Cir. 2005). "Claims of ineffective assistance of counsel usually must be addressed first by the district court pursuant to a motion under 28 U.S.C. § 2255." *United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000) (*citing United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999)). An exception to this rule exists when the record is adequately developed to allow the court to assess the merits of the issue. *Hall*, 200 F.3d at 965.

Here, Burston alleges that his counsel was deficient because he failed to move for severance and waived opening statement. However, because these claims were not raised below and the record is silent as to the surrounding facts, the issues are not sufficiently developed. On their face, decisions on severance and opening statement and whether to object to specific pieces of evidence are issues of trial

strategy which cannot serve as the basis for ineffective assistance claims unless they "permeate the entire trial with obvious unfairness" (*Miller v. Francis*, 269 F.3d 609, 615-16 (6th Cir. 2001)), a claim Burston did not make. On the present record it is impossible to determine whether these decisions constitute deficient performance or sound strategy or whether Burston suffered any prejudice as a result of them.

### D. Burston's Developed Ineffective Assistance Claim Fails the Strickland Test.

The only claim of ineffective assistance raised here that is arguably developed enough for review is Burston's claim that his Exhibit 202 was not sent back to the jury with the other exhibits in the case. It does not pass the *Strickland* test.

First, to establish deficient performance, the proponent must show not only an error, but that counsel's errors undermined the adversarial process so that "the trial cannot be relied upon as having produced a just result." *Strickland*, 466 U.S. at 687-88. Burston's claim that his counsel failed to designate Exhibit 202 as one that should be sent back to the jury during its deliberations in a mistaken belief that the court had denied its admission (R. 328: TR 2/13/09 at 1833), does not rise to that level.

Moreover, Burston cannot show prejudice from the alleged deficiency. Whether Exhibit 202 (the agent's report of interview of Lemus) accompanied the

jury during deliberations could have little effect because the exhibit's contents were placed on the record numerous times during Lemus' cross-examinations (R. 328: TR 2/5/09 at 342-48, 353-55, 371-74, 377, 385, 399, 416-423) and were the subject of a cautionary instruction which underscored them. (*Id.* at 423). It was therefore fully published to the jury. This ineffective assistance claim shoulddjected.

## IX.    Substantial Evidence Proved Ross' and Burston's Guilt.

In reviewing for sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307 (1979). An appellate court will be even more hesitant to disturb a jury's verdict where the district court has thoroughly considered and rejected a Rule 29 motion. *United States v. Lee*, 359 F.3d 412, 418-19 (6th Cir. 2004). A sufficiency challenge, moreover, "is no place . . . for arguments regarding a government witness's lack of credibility," *United States v. Talley*, 164 F.3d 989, 996-97 (6th Cir. 1999). Here, the district court denied two Rule 29 motions for each defendant. (R. 328: TR 2/11/09 at 1683-87 (Burston); 1687-92 (Ross); R. 317: Renewed Motion (Burston); R. 318: Renewed

Motion (Ross); R. 330: Order Denying R. 317; R. 339: Order Denying R. 318; R.

399: 2/27/09 at 3-12 (Burston); R. 401: TR 6/8/09 at 23-33).

Seven accomplices directly implicated Ross in the conspiracy and various

substantive counts of conviction. Three directly implicated Burston in the

conspiracy, not only as Ross' assistant, but as a direct participant in the purchase

of four vehicles with counterfeit checks.

Apart from the accomplices, victim Wells recognized and identified Ross in

court as the man who gave him three counterfeit checks totaling $39,500(Counts

5-7) and his in-court identification was as certain as his identification of Ross

from a photo line-up shortly after the incident. (R. 328: TR 2/10/09 at 1094-1159

(Wells)). Bank surveillance photographs showed Burston cashing a check from the

buyer of a Lexus purchased with a counterfeit cashier's check (TR 2/6/09 at 583-

86 (Goode); 721-27 (Bennet)) and the inked fingerprint of the check-casher was

positively identified as Burston's. (TR 2/6/09 at 765-811 (Koteles)).

A Comerica Bank representative reviewed all the suspicious checks introduced

at trial and testified that they were counterfeit. (R. 328: TR 2/5/09 at 425-60

(Davis). The victims in Count 2 (Beneteau), Count 3 (Klosterman and Seiders),

and Counts 5-7 (Wells) all testified that they were given the counterfeit cashier's

checks in exchange for automobiles. (*Id.,* TR 2/5/09 at 480-512 (Beneteau); TR

2/6/09 at 765-829; 2/9/09 at 992-1031(Klosterman, Mitchell, Seiders); TR 2/10/09

at 1094-1159 (Wells)). An owner of a used car lot who purchased a vehicle

obtained with a counterfeit check placed Ross at his lot (with Dewayne Eli),

picking him out of a photo line up. (*Id.*, TR 2/9/09 at 843-71 (Shaheen)).

Neither Ross nor Burston argue that any particular element was not proven.

Rather, Ross argues that the accomplices were not credible. This Court will not

entertain such a challenge. *Talley,* 164 F.3d at 996-97. He also argues that the

"inconsistent" verdicts on Count Three require reversal because Burston was

acquitted, and he was convicted of aiding and abetting him in that count. It is well

settled, however, that an aider and abetter may legally be convicted even though

the principal is acquitted of the same offense. *Standefer v. United States*, 447 U.S.

10, 19-20 (1980); *United States v. Lawrence*, 555 F.3d 254, 261-62 (6th Cir.

2009).

Burston argues the evidence of conspiracy only established "an association"

with Ross, an assertion totally at odds with the testimony of accomplices Lemus,

Bishop and Goode. He also argues that the "pervasiveness" of the evidence

somehow confused the jury, an inventive, but necessarily unsuccessful attack on

the sufficiency of the evidence. The jury was properly instructed on the elements

of conspiracy, and any one of the three accomplices, who directly implicated

Burston in obtaining counterfeit checks from Lemus for use in the scheme and

established Burston's direct involvement in the purchase of vehicles with

counterfeit checks, satisfied every element as to Burston.

## X. Ross' Sentence Was Reasonable.

### A. *Standard of Review.*

This Court reviews sentences under a deferential abuse of discretion standard

for " reasonableness." *United States v. Blue*, 557 F.3d 682, 684 (6th Cir. 2009).

### B. *The District Court Properly Resolved Disputed Guideline Issues and Properly Calculated Ross' Guideline Range to Impose A Procedurally Reasonable Sentence.*

If a defendant willfully attempts to obstruct or impede the prosecution, a two-

level increase in his offense level is warranted, and making materially false

statements to a judge is explicitly defined as obstruction. USSG § 3C1.1,

Application Note 4(c). The district court had "little trouble" applying this

enhancement, citing Ross' attempts to get appointed counsel removed: ". . .Mr.

Ross engaged, in my view, in a deliberate attempt to create a record with evidence

that was not true about a conflict between Mr. Early and him, even attributing

conduct to Mr. Early that was illegal and unethical in an effort to persuade the

Court to remove Mr. Early from the case." (R. 403: TR 6/25/09 at 24). The court

went on to describe how Ross "led me to believe that he had no means or ability to

61

contact Mr. Carjamarco and it [later] appeared. . .that they had been in contact, that they had had discussion." (*Id.*; *see* R. 268: TR 12/9/08 at 3-5). The court concluded after the December 9 evidentiary hearing that "the information in the [*pro se*] motion therefore was willfully false and it perpetuated the effort to remove Mr. Early from the case when, in fact, there was no just reason to do so." (R. 403: TR 6/25/09 at 25). This alone provided ample evidence of obstruction under the guidelines.

Given the testimony of seven accomplices that Ross recruited them either directly or indirectly, that he sent them on various deals, that he told them what roles to play with the victims, and received the bulk of the proceeds, all set forth above, and all specifically found by the court based on the trial testimony (R. 404: TR 6/26/09 at 72-73), there is also no merit to Ross' challenge to the role in the offense adjustment under USSG § 3B1.1(a). *See United States v. Hernandez*, 227 F.3d 686, 700 (6th Cir. 2001); USSG § 3B1.1, Application Notes 2, 4.

Ross' argument against USSG § 2B1.1(b)(2)(A)'s two-level enhancement for offenses involving more than 10 victims is equally unavailing, as the court had the benefit of the trial evidence linking Ross to 14 transactions, as well as various local police reports submitted by Ross and the government at the time of sentencing, establishing, to the court's satisfaction, 15 victims. (R. 403: TR

62

6/25/09 at 11-12; R. 404: TR 6/26/09 at 76-99; *see* R. 376: Judgment at 8

(showing names and pecuniary losses suffered by 15 victims)). The sentencing

record is clear that the court relied not only on the presentence report for the

number of victims and their losses, but also on the evidence presented at trial and

the submissions of the parties (police reports) to modify the presentence report's

findings. (R. 404: TR 6/26/09 at 127).

Ross' challenge to the amount of loss calculations is based on the assertion that

it was improper for the district court to rely on the statements of witnesses who did

not testify at trial (despite his reliance on such evidence at sentencing). The law is

otherwise. *United States v. Herrera,* 928 F.2d 769 (6th Cir. 1991)(discussing

"minimum indicia of reliability" test). His other argument relative to this

enhancement is undeveloped. He claims that the court "relied on" a case report

containing "inconsistencies and false statements," but never specifies either what

factual findings were made in reliance on such a report or where and how the

report was "shown" to contain false statements, and offers no authority for his

argument. (Ross Brief at 51). In any case, the record shows that the court

meticulously addressed each of Ross' objections, and not only made specific

factual findings, but attributed those findings to a source in the record, either at

trial or in the sentencing exhibits provided. (R. 404: TR 6/26/09 at 46-99). Ross'

sentence, then, was procedurally reasonable because it was based on a properly

calculated guidelines range.

## XI.    Burston's Due Process Rights Were Not Violated by Ross' Self-representation and Trial Conduct.

Burston argues that the cumulative effect of Ross's trial conduct denied him a

fair trial, but cites no authority for the proposition that a co-defendant's "deficient"

behavior as his own attorney can so prejudice a represented co-defendant as to

violate his right to a fair trial. The government acknowledges that a "cumulative

error analysis" has been employed by this Court reviewing due process claims, but

the analysis requires an accumulation of *errors*, not just occurrences, to even be

considered as violative of due process. *Campbell v. United States*, 364 F.3d 727,

736 (6th Cir. 2004)(cumulation of non-errors cannot collectively amount to a

violation of due process). Burston does not explain how the conduct he cites was

"error" or what effect it had on him.

Burston's first cites the mixed roles or "overlap" of standby counsel and Ross,

but the only instance cited, standby counsel's "injecting the entire polygraph issue

into the trial" (Burston Brief at 17) actually benefitted Burston. There is no

showing that counsel's objection was erroneous. All of the argument on the issue

was conducted outside the presence of the jury. (*See* Argument II, above). The

subject of Burston's second complaint, the procedure that standby counsel rather

than Ross would be used to approach witnesses, is innocuous. The jury was never advised that this was an unusual procedure, and it was more likely to be seen as a matter of expedience rather than an implicit signal of Ross' bad character, and, by association, Burston's. There was no error in this practice.

Burston also cites eight instances of Ross' sometimes coarse and argumentative cross-examination without explaining how they are individually "error." (Burston Brief at 18-19). He fails to cite any authority for the proposition that the prosecutor's objection that Ross was testifying during cross-examination (". . .there is a proper time for Mr. Ross to testify, and this isn't it. . .") was error, especially in light of the standard instructions on the defendants' choice not to testify. The prosecutor never called Burston a "lackey" and made only fair argument about Burston's subordinate role in the conspiracy. (*see* Argument VI, above). The comments of the court were not erroneous as to Ross (*see* Argument V, above) and were, therefore, certainly not as to Burston. Thus, Burston's argument is based on a "cumulation of non-errors," which cannot serve as a basis for a due process challenge.

## XII.  The District Court Properly Exercised its Discretion in Admitting Government Exhibit 125, a Copy of the Check Bearing Burston's Inked Fingerprint.

Burston argues that the district court abused its discretion by admitting Exhibit 125 (R. 429 at 5), a photocopy of one of two proceeds checks issued to Burston and Goode on the resale of a car derived from Ross' scheme. Although the check was the subject of a motion in limine (R. 209: Motion; R. 275: TR 11/24/08 at 74-89 (hearing); R. 244: Order at 1-7) and a contemporaneous objection when offered into evidence at trial (R. 328: TR 2/6/09 at 579-80), the basis for the issue on appeal is one that was not raised below: that the use of a photocopy, and the unavailability of the original, foreclosed Burston from having the original reviewed for latent fingerprints to determine "whether he had personally handled the check thereby leaving latent fingerprints on it." (Burston Brief at 30-31). Thus, the issue should be reviewed for plain error. *Baker*, 458 F.3d at 517.

Considering the nature and context of the evidence, it is not surprising that Burston did not make this argument at trial. Goode said that he and Burston got two checks from a business they sold the car to, went to the bank to cash them, and the bank required them to put an inked fingerprint on the checks to negotiate them. Goode identified Exhibit 125 as a copy of the check Burston negotiated. Burston

and Goode are visible in surveillance photographs engaging in the transaction. The inked fingerprint impression was identified by an expert as Burston's.

Burston does not explain why it was unfair to admit the photocopy. Even if his *latent* prints were not on the original, it would not create a defense. Latent prints are not always left. His *inked* fingerprint was on the check. Burston presented nothing to the court below on this issue (R. 244: Order at 4: ". . .and there has been no request for latent prints. . ."); rather he focused on his inability to have an independent handwriting expert analyze the endorsement, which the court addressed by forbidding any testimony or argument suggesting that Burston signed the check. *Id*. at 5-6). Thus, far from plain error or an abuse of discretion in the admission of this highly probative evidence, the court properly exercised its discretion under Federal Rule of Evidence 1003 (duplicate may be admitted in lieu of original unless there is a genuine question as to authenticity or the circumstances make the admission unfair).

## CONCLUSION

Burston's conviction should be affirmed and both Ross' conviction and sentence should be affirmed.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

s/ *Craig A. Weier*
CRAIG A. WEIER
Assistant U.S. Attorney
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
(313) 226-9678

Dated: August 24, 2010

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)

I certify that this brief contains 15,949 words.

s/ *Craig A. Weier*
CRAIG A. WEIER
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE AND FILING

I certify that on August 24, 2010 I electronically filed the foregoing Brief for the United States with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system which will send notification of such filing to the following:

Patricia A. Streeter
William J. Winters, III


s/ ***Craig A. Weier***
CRAIG A. WEIER
Assistant U.S. Attorney

## RELEVANT DISTRICT COURT DOCUMENTS

Appellee, hereby cites to the following documents in the district court's record:

| REF. NUMBER | DOCUMENT DESCRIPTION | DATE |
|---|---|---|
| R. 1 | Indictment | 10/16/07 |
| R. 5 | Appearance of Mark H. Magidson for Ross | 10/19/07 |
| R. 34 | Trial Notice | 11/19/07 |
| R. 35 | Motion to Modify Conditions of Pretrial Release | 11/20/07 |
| R. 40 | Response by USA to Motion to Modify | 11/30/07 |
| R. 42 | Motion to Dismiss | 12/03/07 |
| R. 43 | Motion for Discovery | 12/05/07 |
| R. 44 | Motion to Dismiss | 12/05/07 |
| R. 45 | Motion for Bill of Particulars | 12/05/07 |
| R. 49 | Order Denying Motions re R. 42, R. 43, R. 44, R. 45 | 12/06/07 |
| R. 52 | Motion for Discovery | 12/06/07 |
| R. 53 | Motion to Dismiss | 12/06/07 |
| R. 54 | Motion for Bill of Particulars | 12/06/07 |
| R. 55 | Motion to Inspect Records | 12/06/07 |
| R. 57 | Motion to Reschedule Dates | 12/12/07 |
| R. 60 | Order Granting Motion to Reschedule Dates | 12/17/07 |
| R. 61 | Motion for Withdrawal of Attorney Mark H. Magidson | 12/19/07 |
| R. 73 | Motion and Brief to Cancel All Motions filed by Magidson | 12/28/07 |
| R. 76 | Appointment of Attorney Jeffrey L. Edison | 01/08/08 |

| R. 77 | Motion for Reconsideration | 01/22/08 |
|---|---|---|
| R. 80 | Order to Continue Ends of Justice | 02/01/08 |
| R. 82 | Motion to Dismiss | 02/28/08 |
| R. 85 | Order Denying Motion to Dismiss | 03/10/08 |
| R. 87 | Motion for Reconsideration | 03/13/08 |
| R. 96 | Order Granting Attorney Withdrawal and Appointment of Substitute Counsel | 04/01/08 |
| R. 98 | Appointment of Robert F. Kinney, III | 04/02/08 |
| R. 101 | Appointment of S. Allen Early, III | 04/21/08 |
| R. 103 | Order to Continue Ends of Justice | 04/28/08 |
| R. 104 | Order Granting Motion for Reconsideration | 05/02/08 |
| R. 107 | Motion to Exercise Sixth Amendment Right to Self-Representation | 05/13/08 |
| R. 108 | Motion for Psychiatric Exam | 05/16/08 |
| R. 114 | Response to Motion for Psychiatric Exam | 05/19/08 |
| R. 125 | Combined Motion and Brief to Dismiss Indictment | 05/28/08 |
| R. 139 | Motion to Substitute Counsel Until Trial by Ross | 06/10/08 |
| R. 141 | Response to Motion to Dismiss Indictment | 06/13/08 |
| R. 148 | Order Denying Motion to Dismiss | 06/17/08 |
| R. 150 | Order Granting Emergency Motion to Adjourn Trial | 06/19/08 |
| R. 164 | Motion for Mental Competency Examination | 07/30/08 |
| R. 167 | Response to Motion for Mental Competency | 07/31/08 |
| R. 168 | Motion in Limine to Exclude Evidence of Alleged Misconduct | 08/01/08 |
| R. 172 | Motion for Determination re Service and Enforcement of Subpoenas | 08/01/08 |

| R. 174 | Transcript: Motion Hearing 05/30/08 | 08/01/08 |
|---|---|---|
| R. 176 | Order Granting Motion for Competency Examination | 08/05/08 |
| R. 179 | Response to Motion for Determination | 08/04/08 |
| R. 184 | Order Directing Competency Exam | 08/12/08 |
| R. 185 | Transcript: Motion Hearing 06/12/08 | 08/15/08 |
| R. 203 | Order Finding Defendant Ross Competent to Stand Trial | 10/29/08 |
| R. 208 | Motion in Limine | 11/06/08 |
| R. 209 | Motion in Limine [Burston] | 11/07/08 |
| R. 238 | Order Adjourning Trial | 11/24/08 |
| R. 244 | Order Granting in Part and Denying in Part Burston's Motion in Limine | 11/26/08 |
| R. 248 | Emergency Motion to Remove Standby Counsel S. Allen Early | 12/01/08 |
| R. 251 | Order to Continue Ends of Justice | 12/02/08 |
| R. 253 | Response to Motion to Remove Counsel | 12/03/08 |
| R. 257 | Motion in Limine | 12/08/08 |
| R. 260 | Motion to Dismiss for Loss or Destruction of Evidence | 12/08/08 |
| R. 262 | Order Appointing Richard Korn | 12/10/08 |
| R. 265 | Order Adjourning Trial | 12/23/08 |
| R. 266 | Response by United States | 12/29/08 |
| R. 267 | Order Denying Motions in Limine | 01/05/09 |
| R. 268 | Transcript: Motion to Relieve Standby Counsel 12/09/08 | 01/09/09 |
| R. 274 | Order to File Transcript Under Seal of 11/13/08 | 02/03/09 |

| R. 275 | Transcript: Motion Hearing 11/24/08 | 02/03/09 |
|--------|--------------------------------------|----------|
| R. 279 | Transcript: Motion Hearing 01/05/09 | 02/03/09 |
| R. 291 | Motion for New Trial | 02/17/09 |
| R. 292 | Motion to Dismiss for Speedy Trial Violations | 02/17/09 |
| R. 295 | Jury Verdict Form [Burston] | 02/13/09 |
| R. 297 | Jury Verdict Form | 02/13/09 |
| R. 300 | Memorandum of Law in Support of Motion for New Trial | 02/18/09 |
| R. 317 | Renewed Motion for Judgment of Acquittal [Burston] | 03/25/09 |
| R. 318 | Renewed Motion for Judgment of Acquittal | 03/27/09 |
| R. 328 | Transcripts: Jury Trial 02/04/09; 02/05/09; 02/06/09; 02/09/09; 02/10/09; 02/11/09; 02/12/09; and 02/13/09 | 05/06/09 |
| R. 330 | Order Denying Burston's Renewed Motion for Judgment of Acquittal | 05/28/09 |
| R. 339 | Order Denying Motion for New Trial | 06/09/09 |
| R. 359 | Ex Parte Order | 11/14/08 |
| R. 360 | Ex Parte Order | 11/20/08 |
| R. 361 | Ex Parte Order | 11/24/08 |
| R. 362 | Ex Parte Order | 12/05/08 |
| R. 363 | Ex Parte Order | 02/05/09 |
| R. 366 | Notice of Appeal | 06/27/09 |
| R. 369 | Notice of Appeal [Burston] | 06/29/09 |
| R. 376 | Judgment | 07/01/09 |
| R. 377 | Judgment [Burston] | 07/01/09 |

| R. 382 | Transcript: Ex Parte Hearing 11/13/08 | 08/04/09 |
|--------|----------------------------------------|----------|
| R. 391 | Transcript: Motion Hearing 12/20/07 | 09/17/09 |
| R. 392 | Transcript: Motion Hearing 01/24/08 | 09/17/09 |
| R. 395 | Transcript: Motion Hearing 08/05/08 | 09/17/09 |
| R. 396 | Transcript: Competency Hearing 10/29/08 | 09/17/09 |
| R. 397 | Transcript: Motion in Limine 11/06/08 | 09/17/09 |
| R. 399 | Transcript: Motion Hearing 05/27/09 | 09/17/09 |
| R. 401 | Transcript: Motion for New Trial 06/08/09 | 09/17/09 |
| R. 403 | Transcript: Sentencing 06/25/09 | 09/17/09 |
| R. 404 | Transcript: Sentencing 06/26/09 | 09/17/09 |
| R. 418 | Transcript: Status Conference 11/20/08 | 01/11/10 |
| R. 427 | Report of William R. Nixon, Jr. | 05/18/10 |
| R. 428 | Notice of Filing | 06/24/10 |
| R. 429 | Notice of Filing | 06/28/10 |